**In the Interest of B.L.D. and B.R.D., Children**

No. 10–99–335–CV.

Court of Appeals of Texas, Waco.

July 18, 2001.

Rehearing Overruled Aug. 8, 2001.

Nita Fanning, Waco, for appellant.

John W. Segrest, Dist. Atty., James Wiley, Asst. Dist. Atty., Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY (Justice GRAY dissenting).

## OPINION

PER CURIAM.

This is an appeal from the termination of the parental rights of Spring and Jimmy Dossey over two of their three children, B.L.D. and B.R.D. A third child was born during the course of these proceedings and was placed with a friend shortly after birth. That child is not a subject of this case. Spring and Jimmy appeal on multiple points of error. Because we believe Spring and Jimmy were not effectively represented at trial due to a conflict of interest caused by their having a single court-appointed lawyer, and because the construction of the charge deprives them of their right to a verdict by at least ten or more jurors, we will reverse for a new trial.

### FACTUAL AND PROCEDURAL BACKGROUND

Before the events in this case, Spring's and Jimmy's only contact with the Texas Department of Protective and Regulatory Services—Child Protective Services ("CPS") was in 1995 just after their first child, B.L.D., was born. Spring, age eighteen, was taking her thirteen-year-old brother to school. At the car her brother realized he had forgotten his school books. Spring set B.L.D., who was in his car-seat carrier, on the trunk of the car and went back to retrieve the books. Her brother got into the car and slammed his door, causing B.L.D. to fall off the trunk. B.L.D.'s skull was fractured, but he fully recovered. CPS investigated and found the incident to be an accident.

On February 23, 1998, Spring and Jimmy had been living in a rented trailer home for about two weeks. With them were their two sons, B.L.D., age three, and B.R.D., age one-and-a-half. Spring was seven-and-a-half months pregnant with their third child. Jimmy, age twenty-one, rarely worked because he had a serious heart disease and a pacemaker.[1] During the course of these proceedings he was placed on social security disability. Spring, also age twenty-one, often worked two jobs to make ends meet.

The morning of February 23 Jimmy took Spring to the emergency room because she was suffering from a painful ear infection. "Wicks" were put in her ears and medication was prescribed. Once home, Spring, groggy from lack of sleep and medication, lay down to rest and took B.R.D. with her. Jimmy and B.L.D. were outside. Spring told authorities she was awakened by B.R.D.'s cries. She found him on the kitchen counter-top at the sink. He had been seriously scalded on his right foot. Testimony at trial was that the hot water coming from the tap in the trailer was heated to 180˝ instead of the normal 115˝ to 120˝. Spring called out to Jimmy, and they took B.R.D. to the emergency room. Nurse Duncum, a treating nurse at the hospital, was suspicious of the injuries because of the pattern of the scalding which she thought was inconsistent with an accidental event. She called CPS which sent personnel to the hospital. Both boys were taken into custody by CPS.

Initially Spring told authorities she knew nothing about how the injury occurred. Later, after failing a polygraph test, she admitted that she heard B.R.D. making playful noises and found he had pulled a chair to the sink and was playing in the water. Trial testimony from several witnesses including CPS workers was that at the time B.R.D. was rambunctious and "a climber." Spring turned off only the cold water tap, not realizing the hot water was also on, and briefly turned her back. B.R.D.'s foot made contact with the 180° water and he was scalded. Spring said she initially lied because, with her background of being sexually abused by her father, she thought she might be suspected of abuse. Criminal charges were later brought against Spring for the injury, but she was never indicted. The CPS agent who had primary oversight for the case, Ms. Sheffield, testified at trial she thought the injury was accidental. She said that had CPS believed there was an intentionally-inflicted serious injury, CPS would never have recommended, as it did later, reunification of the family. B.R.D. fully recovered from the scalding.

The State instituted legal proceedings regarding custody,[2] and a Plan of Service was implemented. Jimmy and Spring had to undergo counseling and pay child support. Finances, housing, and transportation were a continual problem. Also, CPS had a strong objection to the children being around Spring's father who had sexually molested her from ages seven to seventeen, and who was currently involved in adult pornography. Spring took measures not to associate with her father. Finally, Spring's and Jimmy's third child had been born and, with CPS's approval, was placed with their friend, Ms. Brewington.

In spite of these problems, at a status hearing on October 27, 1998, CPS suggested that by February 1999, and regardless of the scalding incident, the conditions would probably be ripe for returning the

---

1. He had a heart attack at age eighteen and a stroke at age nineteen.

2. Proceedings such as this are brought in the name of the Texas Department of Protective and Regulatory Services, a State agency.

children. However, the trial court thought conditions had improved enough to order B.L.D. and B.R.D. returned to Spring and Jimmy immediately. The family was reunited, but housing continued to be troublesome. In late 1998, Jimmy, B.L.D., B.R.D., and the baby lived for a number of weeks with Brewington and her family.

On January 9, 1999, Jimmy stole a gun from his next-door neighbor's house. He testified he intended to sell it to get money for his family. He avoided prosecution by becoming an undercover "buyer" for the Agriplex Drug Taskforce. Both of these pieces of evidence were admitted at trial over objection.[3] Meanwhile, by February 1999 Brewington was not cooperating with Spring and Jimmy on their requests for overnight visitations with the baby. Instead, Brewington called CPS and reported that when Spring and Jimmy were staying with her back in the Fall of 1998, Brewington found a picture in the recycle bin of her computer of a "child" engaged in sexual intercourse. The picture was admitted into evidence at trial.[4] Through some sleuth work of her own using the date and time the picture had been deleted to the recycle bin, she suspected that Jimmy was the culprit who originally downloaded the picture from the internet.[5] Over objection, this evidence was introduced at trial. Brewington admitted at trial that her own children and their friends viewed pornography on the computer, and that several other people had access to it. After this accusation, CPS again took B.L.D. and B.R.D. into custody.

Two additional incidents occurred shortly before trial. There was an altercation between Spring and Jimmy in a Wal–Mart parking lot. Jimmy was charged with a Class C assault on Spring for chasing and punching her. Over objection, this evidence was admitted at trial. In addition, Jimmy failed two of his periodic drug tests, one for marijuana use and another for methamphetamine use.

About two months before trial Spring's and Jimmy's retained lawyer made a motion to withdraw because Spring and Jimmy could no longer afford to pay him. Spring and Jimmy requested the court to appoint that same lawyer to represent them. The court refused and appointed another lawyer who then had two months to learn the case and prepare for trial.

The record from hearings that took place over the six to eight months before trial indicates a growing concern on everyone's part about the August 27, 1999, date which was approaching for the State to either move for dismissal and possibly have to return the children, or proceed to a termination trial. TEX. FAM. CODE ANN. § 263.401 (Vernon Supp.2001); *see, e.g., In re Bishop,* 8 S.W.3d 412, 418–19 (Tex. App.—Waco 1999, orig. proceeding). The case was tried to a jury August 23–26, 1999. B.R.D. was now five years old, and B.L.D. was three years old. The State called an array of witnesses including a psychologist, Dr. Shinder, who said the parental relationships should be terminated. By a vote of ten to two, the jury found that Spring's and Jimmy's parental rights should be terminated.

---

3. This complicated his position because the jury was given the impression he was dangerous and also well connected in the drug world.

4. The picture is of a partially nude female, possibly age fifteen to early twenties, having intercourse with an adult male.

5. Brewington testified she sent an employee to her home about the time the picture was deleted to the recycle bin, and the employee told her only Jimmy was at home. The employee did not testify at trial.

Spring and Jimmy bring eight issues on appeal.

1. Spring and Jimmy should have had separate court-appointed lawyers at trial. A conflict of interest prevented a single lawyer from effectively representing them both.

2. Nurse Duncum was not qualified to testify as an expert about whether the scalding was intentionally caused.

3. The evidence was legally and factually insufficient that Spring and Jimmy knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children.

4. The evidence was legally and factually insufficient that Spring and Jimmy engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children.

5. Evidence of Jimmy's alleged sexual misconduct and other bad acts was inadmissible.

6. There should have been specific questions asked of the jury about whether termination was in the best interest of the children.

7. The jury should have been asked to decide separately which of the two statutory grounds alleged for termination had occurred; the disjunctive charge and broad form questions precluded this.

8. The Judgment improperly failed to include specific findings of the grounds for termination.

We will consider the issues out of order, as necessary to dispose of the appeal.

## ISSUE ONE: REPRESENTATION BY A SINGLE LAWYER

### Background

Spring and Jimmy initially hired a lawyer to represent them. That lawyer, Ray, worked on the case from April 1998 to June 1999, when Spring and Jimmy ran out of money. They asked the court for a court-appointed lawyer and for Ray to be appointed. Instead, the court appointed Villarrial who was not previously involved with the case.

At a hearing on August 17, 1999, a week before trial, Villarrial asked the court for separate trials for Spring and Jimmy. He said: "[A]t this time it has come to my attention through reading the record and talking to my clients that there is a potential for conflict of interest.... [T]he way the testimony is going to come in and the way I anticipate the testimony to come in, I would ask that this court sever Spring Dossey's case from Jimmy Dossey's case ... so that I can adequately represent one client at a time." He added: "[You can] take the cases in any order you want. I realize that we have a time limitation." (Referring to the August 27, 1999, dismissal date). The court immediately denied the request. Nevertheless, Villarrial called Spring and then Jimmy to give testimony.

Spring said she was "very satisfied" with Villarrial's representation of her so far. She understood that "at some point [there might be] testimony ... looking like some things might hurt [her] because of what [Jimmy] did and some things might hurt [Jimmy] because of what [she] did." She said that Villarrial told her he thought he could represent both of them "to the best of [his] ability" because Spring and Jimmy were "asking for substantially the same thing." She said she agreed to joint representation. Jimmy testified he was "greatly" satisfied with Villarrial's representation to date, and that he agreed to the joint representation and "waiv[ed] any conflict" based on "what [Villarrial] explained about the conflict and substantially

the same interest that [he] and his wife [had]."

At trial after the close of evidence and before final arguments, Villarrial reurged his motion for separate trials.

The reason I made that [pretrial] motion was, in part—well, actually the main reason and the only reason I made that motion was because it became apparent to me at the time that I was reviewing this case and reading the documents that an apparent conflict could arise ... and that if the line of testimony developed the way I thought that it would develop, that it would, in fact, create a potential conflict.... [A]t that time ... because [they] were both asking for substantially the same thing, they were asking both to get their kids back, I thought from a legal standpoint that a conflict ... did not exist, but I stated at that time that I thought there was a good chance that the way that the testimony was going to develop, that, in fact, a conflict would be created between my clients.... As things have developed, I think it's apparent to everybody ... that indeed a conflict has occurred in this trial, your Honor.... With the exception of the burning of the feet which is what started this whole case, everything has gone against Jimmy Dossey, a big portion of this, and because of that, if I were representing one individual in this case, for example, Spring Dossey, my defense of Spring Dossey would be to point the finger at Jimmy Dossey in this case and say, "You terminate as to that guy because he has got a problem, but do not terminate as to Spring Dossey," and because of that, a conflict has arisen, Judge, and again I would have to move that we sever this cause in order for Spring Dossey and Jimmy Dossey

both to get a fair trial, and I so do move at this time.

The court denied the motion.

During closing argument, Villarrial skirted the issue by telling the jury that Spring and Jimmy were not a "team" under the law, and reminding them that Spring testified she would leave Jimmy if his rights were terminated but not hers.

Spring and Jimmy complain on appeal that the trial court erred by failing to appoint separate lawyers. Technically, their trial lawyer moved for separate trials, not for separate lawyers. However, since the intended result is the same under either motion, *i.e.*, that Spring and Jimmy each have a lawyer at trial who is in a position to advocate solely for her or him, we will treat the issue as whether the representation of Spring and Jimmy at their trial by one lawyer denied them effective representation of counsel.

The State's only response is that at the August 17 hearing Spring and Jimmy waived any conflict from joint representation. The State further said in its brief that if there was a conflict at trial, then there is also a conflict on appeal because there is only one appellate lawyer. The State went on to suggest that because there was no waiver of the conflict as to the appeal, we should report the appellate lawyer's breach of rule of ethics 1.06. We should point out to the State that the fact the record does not show a waiver as to the appeal does not mean there has not been one. Furthermore, the State's silence about the substance of this issue, and its diversion to an attack on the ethics of the appellate lawyer, do nothing to assist in resolving the issue.

### The Right to Effective Assistance of Counsel

Section 107.013 of the Family Code provides that in a termination suit, the court

must appoint an attorney for an indigent parent. TEX. FAM. CODE ANN. § 107.013(a) (Vernon Supp.2001). Furthermore, "[i]f both parents of the child are entitled to the appointment of an attorney ... and the court finds that the interests of the parents are not in conflict, the court may appoint a single attorney ... to represent the interests of both parents." *Id.* (b). Villarrial was appointed under this statute. The statute impliedly endorses the principle that a parent whose parental rights are in jeopardy has a right to counsel—retained or, if the parent is indigent, appointed—to defend those rights. Spring's and Jimmy's issue on appeal is about whether they had a right for that representation to be effective, *i.e.*, in this case, free of conflicts.

Recently in *In the Interest of J.F.C., A.B.C., and M.B.C.*, 2001 WL 533218 (Tex.App.—Waco, May 16, 2001), we held that we will review unpreserved complaints about charge errors that pertain to the two core issues in a termination case, *i.e.*, (1) the statutory predicate grounds for termination, and (2) whether termination is in the best interest of the child. We cited *In Interest of S.R.M.*, 601 S.W.2d 766, 769–770 (Tex.Civ.App.—Amarillo 1980, no writ) (parental rights were terminated based on trial evidence of grounds not pled, without objection; case reviewed, and reversed, for insufficient evidence in spite of trial by consent, because of the constitutional dimension of termination cases). *J.B.C.* followed our holding in *In the Interest of A.P. and I.P.*, 42 S.W.3d 248 (Tex.App.—Waco 2001), that we will review unpreserved sufficiency-of-the-evidence complaints ab out the two core issues in termination cases. Both cases were based on procedural due process. As we explained, the "natural right existing between parents and their children is of constitutional dimensions." *See,*

*e.g., Holick v. Smith,* 685 S.W.2d 18, 20 (Tex.1985) (referencing *In re G.M.,* 596 S.W.2d 846, 846 (Tex.1980)); *In re Verbois,* 10 S.W.3d 825, 830 (Tex.App.—Waco 2000, orig. proceeding); *Spangler v. Texas Dep't of Protective & Regulatory Servs.,* 962 S.W.2d 253, 256 (Tex.App.—Waco 1998, no pet.); *see also In re T.V.,* 8 S.W.3d 448, 449–50 (Tex.App.—Waco 1999, order)) (an indigent person whose parental rights have been terminated is entitled to court-appointed counsel on appeal), *disp. on merits,* 27 S.W.3d 622 (Tex.App.—Waco 2000, no pet.). "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49 (2000) (grandparent's rights case; "... the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court" (citing *Meyer v. Nebraska,* 262 U.S. 390, 399, 401, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)). A parent's right to the parent-child relationship is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick,* 685 S.W.2d at 20 (quoting *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972)).

Because the parent-child relationship enjoys constitutional protection, the standard of proof in a termination proceeding is elevated from "preponderance of the evidence" to "clear and convincing evidence." *Santosky,* 455 U.S. at 747, 102 S.Ct. at 1391. "[S]tate intervention to terminate the relationship between [a parent] and [the] child must be accomplished by procedures meeting the requisites of the Due Process Clause." *Id.,* 455 U.S. at 753, 102 S.Ct. at 1394 (quoting *Lassiter v. Department of Social Services,*

452 U.S. 18, 37, 101 S.Ct. 2153, 2156, 68 L.Ed.2d 640 (1981) (first dissenting opinion), and at 24–32, 101 S.Ct. at 2158–2162 (opinion of the Court), and at 59–60, 101 S.Ct. at 2176 (STEVENS, J., dissenting)); *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 120, 117 S.Ct. 555, 566, 136 L.Ed.2d 473 (1996) (state statute denying appeal from a termination proceeding because appellant could not afford the cost of the record violated procedural due process and equal protection). Therefore, "termination proceedings should be strictly scrutinized." *Holick*, 685 S.W.2d at 20. Accordingly, we held in *A.P.* and *J.B.C.* that it was a violation of procedural due process in termination cases to not review unpreserved complaints about sufficiency of the evidence and charge errors concerning the two core issues.[6]

■ Furthermore, in *A.P.* we stated that because both termination cases and criminal cases have elevated burdens of proof over that in ordinary civil trials, *i.e.*, "clear and convincing" evidence in termination cases and "beyond a reasonable doubt" in criminal cases, we thought it a "logical extension" in termination cases to emulate criminal jurisprudence, which, pertinent to *A.P.*, does not require preservation of sufficiency-of-the-evidence issues. In addition to that rationale, we also recognize that when appropriate, harmonization of civil and criminal jurisprudence is one of our goals. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex.Crim.App.2000). Therefore, when appropriate, we look to criminal law to determine similar or corresponding issues in civil law. *E.g., In the Matter of C.M.G.*, 905 S.W.2d 56, 58 (Tex.App.—Austin 1995, no writ) (Section 54.03(e) of the Family Code, which is identical in substance to article 38.14 of the Code of Criminal Procedure, is interpreted pursuant to the decisions of the criminal courts.).

■ In criminal cases there is a constitutional right to counsel. U.S. CONST. amend. VI and XIV. Furthermore, "right to counsel is the right to the effective assistance of counsel." *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 2044, 80 L.Ed.2d 657 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970)); *Robinson v. State*, 16 S.W.3d 808, 812 (Tex.Crim.App.2000). By comparison, in termination cases there is a statutory right to counsel.[7] Because of the procedural due process concerns we expressed in *A.P.* and *J.B.C.*, and now in this case, and our recognition that it is appropriate in termination cases to "extend" and harmonize with criminal jurisprudence, we now hold that the statutory right to counsel likewise means the right to effective assistance of counsel. Our sister court in Houston agrees. *In the Interest of J.M.S.*, 43 S.W.3d 60 (Tex.App.—Houston [1st Dist.] 2001).[8] Just as a Sixth Amendment

---

6. We are constitutionally required to follow the directives of the United States Supreme Court when they differ with state procedural law, and therefore we will not apply Rule 33.1 regarding these two issues. U.S. CONST. art. VI ("This Constitution ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby ....").

7. "When deprivation of parental status is at stake, however, counsel is sometimes part of the process that is due." *M.L.B.*, 519 U.S. at 123, 117 S.Ct. at 567 (citing *Lassiter*, 452 U.S. at 31–32, 101 S.Ct. at 2161–62).

8. Other courts do not agree. *In re B.B.*, 971 S.W.2d 160, 172 (Tex.App.—Beaumont 1998, pet. denied); *Arteaga v. Texas Dep't of Protective and Regulatory Servs.*, 924 S.W.2d 756, 762 (Tex.App.—Austin 1996, writ denied); *In re J.F.*, 888 S.W.2d 140, 143 (Tex.App.—Tyler 1994, no writ); *Posner v. Dallas County Child Welfare Unit*, 784 S.W.2d 585, 588 (Tex. App.—Eastland 1990, writ denied); *Howell v. Dallas County Child Welfare Unit*, 710 S.W.2d 729, 734–35 (Tex.App.—Dallas 1986, writ ref'd n.r.e.).

constitutional right to counsel in a criminal case includes a right that the representation be effective, a statutory right to counsel in a termination case includes a due-process right that the representation be effective.

### The Legal Standard

Having concluded that Spring and Jimmy had a right to effective assistance of counsel, we must now determine if they received effective assistance. Again, in the interest of harmonization, we look to criminal jurisprudence for guidance.

■ In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), the Supreme Court discussed Fourteenth Amendment (and thereby Sixth Amendment) ineffective-assistance-of-counsel claims in the context of a defense lawyer who has a conflict of interest arising from representation of multiple clients.[9] Texas follows the *Cuyler* analysis. *See, e.g., Monreal v. State*, 947 S.W.2d 559, 564–65 (Tex.Crim.App.1997). In *Cuyler*, two defense lawyers represented three defendants in three trials; the defendants were tried one at a time. The defendant in the first trial, Sullivan, claimed on appeal that the lawyers compromised his defense by, *e.g.*, not calling defense witnesses so that prosecutors would not learn their testimony for use in the two subsequent trials. At a hearing, one of the lawyers admitted that his decision not to call defense witnesses was affected by his concern that

revealing those witnesses would benefit the prosecution in the other two trials. The Court acknowledged that Sullivan did not object to multiple representation until after trial. Nevertheless, the Court said the Fourteenth Amendment was violated if Sullivan could "demonstrate that an actual conflict of interest [occurred which] adversely affected his lawyer's performance." *Cuyler*, 446 U.S. at 348, 100 S.Ct. at 1718, 100 S.Ct. 1708. There is no "prejudice" analysis. Rather, the defendant must only "[show] that his counsel actively represented conflicting interests . . . ." *Id.*, 446 U.S. at 349–50, 100 S.Ct. at 1719.

■ At the pre-trial hearing, Villarrial requested separate trials because of the potential for a conflict between his representation of Spring and of Jimmy. When his request was denied, he called Spring and Jimmy to testify they had been informed of the potential conflict but nevertheless agreed to be jointly represented by Villarrial. The court made no further inquiries into the matter.[10] The State claims that by their testimony Spring and Jimmy "waived" the right to complain about this issue on appeal.[11] However, that is not the law under Texas criminal jurisprudence. If their acquiescence in joint representation is taken as a failure to object—which is debatable because of Villarrial's request for separate trials—that does not preclude a reversal for ineffective assistance of counsel if (1) counsel was

---

**9.** Four years later in *Strickland v. Washington*, 466 U.S. 668, 687–94, 104 S.Ct. 2052, 2064–68, 80 L.Ed.2d 674 (1984), the Court set forth the standard of review now used with all other Sixth Amendment ineffective-assistance claims.

**10.** A trial court has an affirmative duty to make inquires regarding a potential conflict only when an objection to joint representation has been made. However, if the defendant objects and the court refuses to conduct the

inquiry, the defendant is entitled to a presumption of ineffective assistance of counsel. *Lerma v. State*, 679 S.W.2d 488, 494 (Tex. Crim.App.1982) (citing *Holloway v. Arkansas*, 435 U.S. 475, 484, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978), and *Cuyler*, 446 U.S. at 347–48, 100 S.Ct. at 1717–18).

**11.** The "waiver" to which both parties refer is the waiver a defendant can make to representation by counsel, *i.e.*, the right to self-representation. That waiver is irrelevant here.

burdened by an actual conflict of interest at trial, and (2) the conflict had an adverse effect on specific instances of counsel's behavior. *Monreal*, 947 S.W.2d at 564; *e.g.*, *James v. State*, 763 S.W.2d 776, 778–79 (Tex.Crim.App.1989) (following *Cuyler*). "[A]n actual and significant conflict of interest of the degree requiring reversal exists when 'one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to the cause of a co-defendant whom counsel is also representing.' " *James*, 763 S.W.2d at 779 (citing *Foster v. State*, 693 S.W.2d 412 (Tex.Crim. App.1985)); *Pina v. State*, 29 S.W.3d 315, 317 (Tex.App.—El Paso 2000, no pet.).[12] "Where there is evidence of counsel's 'struggle to serve two masters' that cannot be seriously doubted, a finding of ineffective assistance based on counsel's conflict of interest necessarily follows." *Howard v. State*, 966 S.W.2d 821, 826 (Tex.App.—Austin 1998, pet. ref'd) (citing *Ex parte Acosta*, 672 S.W.2d 470, 474 (Tex.Crim. App.1984), and *Ex parte McCormick*, 645 S.W.2d 801, 806 (Tex.Crim.App.1983)). In that event, prejudice or harm need not be shown, and reversal is required. *Ex parte Acosta*, 672 S.W.2d at 474; *McCormick*, 645 S.W.2d at 806.

### *Application*

The State's case, while consisting of a number of witnesses who testified about a variety of matters, revolved around two volatile allegations: Spring was accused of intentionally scalding B.R.D. and Jimmy was accused of being interested in child pornography. The other evidence was not nearly as volatile, *e.g.*, Jimmy consumed drugs on a few occasions, Jimmy hit Spring on a few occasions, Jimmy stole a gun, Jimmy sometimes yelled at the kids, Spring and Jimmy missed some counseling sessions, B.L.D. cracked his skull in an accidental fall while under Spring's care, and Dr. Shinder, although having never made any home visits, called for termination of parental rights based on his office testing of Spring and Jimmy. Furthermore, excluding the scalding and pornography allegations, there was no evidence at trial that:

- The children had been physically abused.

- The children had been sexually abused.

- The children had been exposed to pornography or other sexual activity.

- The children had been exposed to drugs or drug deals.[13]

- The children had been kept in squalid or unsanitary living conditions.

- The children had serious medical needs that were left unattended.

- Spring and Jimmy were unwilling or unable to support the children.

- Spring and Jimmy were being controlled by drugs or alcohol.

Therefore, these two allegations—the scalding and the pornography—were critical to the State's case.

■ Before trial, Villarrial realized the potential problem. It was entirely possible that the question of whether to terminate Spring's parental rights might depend primarily on whether she intentionally scalded B.R.D., a matter in which Jimmy

12. *See also Kegler v. State*, 16 S.W.3d 908, 913 (Tex.App.—Houston [14th Dist.] 2000, no pet.) (defendants pled guilty, and one lawyer argued for both at sentencing before the judge); *Ramirez v. State*, 13 S.W.3d 482, 485–86 (Tex.App.—Corpus Christi 2000, pet. granted) (defense lawyer could not adequately cross-examine the State's witness whom she was defending in another case).

13. Jimmy admitted he smoked marijuana in front of B.L.D. when he was five-months old.

was not involved, and the question of whether to terminate Jimmy's parental rights might depend primarily on whether he was interested in child pornography, a matter in which Spring was not involved. A lawyer representing only one of them could vigorously defend that lawyer's client against specific allegations, without trying to protect or defend the other party against what he or she was accused of, thereby avoiding "guilt by association." Also, each lawyer could "point the finger" at the other party to distance his client from the other. By using these strategies, the jury might have terminated as to the other party, but not as to the lawyer's client.

At trial, the evidence developed exactly according to that pattern. As the trial unfolded, and certainly before closing argument, Villarrial realized his predicament was such that he could not forcibly advocate either 1) for Spring and against, or at least not for, Jimmy, or 2) for Jimmy and against, or at least not for, Spring. This was the substance of his second complaint and request to the trial court. Villarrial had an actual conflict due to his dual representation of Spring and Jimmy. He tried to "straddle the fence" by stating in closing argument that Spring and Jimmy were not legally a "team," and reminding the jury that Spring testified she would leave Jimmy if his rights were terminated but not hers. However, his hands were tied from strongly advocating in favor of either Spring or Jimmy and against the other.

The effect of the conflict is shown by an affidavit attached to Spring's and Jimmy's Motion for New Trial. The affidavit was executed by one of the two jurors who did not vote to terminate parental rights. It states in part: "In our deliberations, it became apparent that our jury was mainly concerned with Jimmy Dossey's ability to parent the children. Based on discussions with other members of our jury, it is my opinion that if Spring Dossey had been tried without Jimmy Dossey, our jury would not have terminated her parental rights. Although Spring Dossey testified that she would leave Jimmy Dossey if our jury terminated his rights and not her rights, many members of our jury were worried that if they did not terminate as to Spring Dossey, she would reunite with Jimmy Dossey at a later date."

Villarrial's performance was adversely affected by the conflict he labored under. Whichever party he strongly advocated for, the other party would have been damaged thereby. That Villarrial "struggl[ed] to serve two masters" cannot be seriously doubted, and that made his counsel ineffective under constitutional standards. *Howard*, 966 S.W.2d at 826.

Spring's and Jimmy's first issue is sustained.

### ISSUE SEVEN: DISJUNCTIVE CHARGE OF THE GROUNDS FOR TERMINATION

#### Background

■ "The termination of the parent-child relationship might be called the capital punishment of civil law." *Sampson & Tindall's Texas Family Code Annotated* Introductory Comment, p. 657 (West 2000). The grounds for termination are listed in section 161.001 of the Family Code. As charged in this case, Spring's and Jimmy's rights would be terminated if the jury found:

1. " . . . that the parent has done at least one of the following:

A. Knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children;

B. Engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children;" *and*

. . . . .

2. "... that termination of the parent-child relationship would be in the best interest of the children...."

*See* TEX. FAM. CODE ANN. § 161.001 (Vernon Supp.2001). As to each child, the jury had to find that Spring and Jimmy violated either "A" or"B" or both, and that termination was in the child's best interest. The jury's findings had to be based on clear and convincing evidence. *Id.* §§ 161.001, 161.206(a). Clear and convincing evidence means "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Spangler v. Texas Dept. of Protective and Regulatory Services,* 962 S.W.2d 253, 256 (Tex.App.—Waco 1998, no pet.); *Leal v. Dept. of Protective and Regulatory Services,* 25 S.W.3d 315, 319 (Tex.App.—Austin 2000, no pet.). Based on their findings, the jury was asked to answer a series of questions of the broad-form: "Should the parent-child relationship between [parent's name] and [child's name] be terminated?"

Spring and Jimmy complain that because of the disjunctive wording regarding "A" and "B," coupled with the broad-form questions which simply asked if the parent-child relationships should be terminated, it is impossible to know if at least ten jurors agreed on a single ground for termination. TEX. R. CIV. P. 292 ("A verdict may be rendered in any cause by the concurrence, as to each and all answers made, of the same ten members of an original jury of twelve ...."). At trial, no objection was made to the charge, and normally we would not review the issue. TEX. R. APP. P. 33.1(a). However, as previously explained, we held in *In the Interest of J.B.C.* that in a termination-of-parental-rights case we will review unpreserved complaints about the two core issues in a charge, *i.e.,* (1) the statutory grounds for termination, and (2) whether termination is in the child's best interest.

### Due Process and the Right to Jury Consensus

The case most often cited in the area of broad-form questions in termination cases is *Texas Dept. of Human Services v. E.B.,* 802 S.W.2d 647 (Tex.1990). The language in the charge in *E.B.* is virtually identical to the language in Spring's and Jimmy's charge. The mother whose rights were terminated complained on appeal that the broad-form questions were inadequate to force compliance with Rule 292, and therefore broad-form questions were not "feasible," Rule 277 of the Rules of Civil Procedure requires broad-form questions "whenever feasible," TEX. R. CIV. P. 277. Based on *E.B .,* the broad-form is also recommended by the Pattern Jury Charges. TEXAS PATTERN JURY CHARGES: FAMILY PJC 218.1B, 218.3B, and 218.3C (1998). The Austin court held that Rule 292 had been violated by the broad-form submission.[14] *E.B. v. Texas Dept. of Human Services,* 766 S.W.2d 387 (Tex.App.—Austin 1989), *rev'd, Texas Dept. of Human Services v. E.B.,* 802 S.W.2d 647 (Tex. 1990). It also held that Rule 277's admonition for broad-form questions could be fulfilled by a series of questions which themselves were in broad-form, *i.e.:* (1) Did the

---

**14.** Rule 277 approves, but does not require, disjunctive questions "when it is apparent from the evidence that one or the other of the conditions or facts inquired about necessarily exists." Based on *E.B.,* the disjunctive form is also recommended by the Pattern Jury Charges. TEXAS PATTERN JURY CHARGES: FAMILY PJC 218.3B (1998).

parent violate statutory ground A?; (2) Did the parent violate statutory ground B?; (3) Is termination in the best interest of the child? *Id.* Finally, the court pointed out that a broad-form question like "Should the parental rights be terminated?" allows the jury to invade the court's province by asking it to "determine the ultimate legal issue of whether the parent-child relationship should be terminated—a function properly served only by a district court's judgment." *Id.*

However, the Texas Supreme Court disagreed. It interpreted "whenever feasible" in Rule 277 to mean "in any or every instance in which it is capable of being used." *E.B.*, 802 S.W.2d at 649. "Unless extraordinary circumstances exist, a court must submit such broad-form questions." *Id.* Regarding Rule 292, the Court said: "The controlling question in this case was whether the parent-child relationship between the mother and each of her two children should be terminated, not what specific ground or grounds under § 15.02 [now § 161.001] the jury relied on to answer affirmatively the questions posed." *Id.*

■ Rule 277 has since been revisited in *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 387–90 (Tex.2000). In *Crown Life* valid and invalid theories of liability were included in a single broad-form question, making it impossible for the appellate court to review whether the jury found for the plaintiff on any valid theory. The Court rejected the assertion that Rule 277

almost invariably requires a broad-form question. "Rule 277 is not absolute; rather, it mandates broad-form submission 'whenever feasible' " *Id.* at 390. The Court reversed the judgment because of the error in the charge. After *Crown Life*, the submission of disjunctive broad-form questions in termination cases, at least without appropriate instructions to guard against a less-than-consensus verdict, is no longer automatic.[15]

The procedural due process rationale we used to dispose of Spring's and Jimmy's effective-assistance-of-counsel issue applies here. Because of the heightened scrutiny in termination cases, we are always mindful of whether the manner in which the jury is charged on "core" issues is constitutional. The Supreme Court discussed jury unanimity and procedural due process in a criminal case in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). The plurality in *Schad* described no bright-line rule for determining the facts on which a jury must reach a consensus. Rather, it said "that instead of such a test our sense of appropriate specificity is a distillate of the concept of due process with its demands for fundamental fairness, . . . and for the rationality that is an essential component of that fairness." *Id.*, 501 U.S. at 637, 111 S.Ct. at 2500. The Court stated the problem as "describing the point at which differences between means become so important that they may not reasonably be viewed as [alternative ways to commit a single crime], but must be

**15.** In addition, while we are bound to follow stare decisis, "[d]ictum, which includes expressions of opinion on a point or issue not necessarily involved in the case, will not create binding precedent under stare decisis." *See Lester v. First American Bank*, 866 S.W.2d 361, 363 (Tex.App.—Waco 1993, writ denied) (citing *Boswell v. Pannell*, 107 Tex. 433, 180 S.W. 593, 597 (1915), and *Grigsby v. Reib*, 105 Tex. 597, 153 S.W. 1124, 1126 (1913)). In fact, *E.B.* is a case about broad-form submissions under Rule 277. It is not a case about disjunctive questions and their effect on whether at least ten jurors agree on which of the statutory grounds for termination occurred, which is the crux of Spring's and Jimmy's complaint on appeal. The part of *E.B.* which briefly discusses that issue is dictum.

treated as differentiating what the Constitution requires to be treated as separate offenses." *Id.*, 501 U.S. at 633, 111 S.Ct. at 2498. The four dissenters added: "Allowing the jury to return a generic verdict following a prosecution on two separate theories with specified elements has the same effect as a jury verdict of 'guilty of crime' based on alternative theories of embezzlement or reckless driving." *Id.*, 501 U.S. at 656, 111 S.Ct. at 2510 (White, B., dissenting).

We hold that in termination cases, procedural due process requires a strict application of Rule 292's requirement of accord by ten or more jurors. As applied to Spring's and Jimmy's case, the disjunctive form of the charge, without more, may violate due process because it allows for the possibility of termination based on a statutory ground not found by at least ten jurors to have been violated.[16] The question is, for what facts in a termination case does due process require agreement among the jurors?

### *The Legal Standard*

As stated above, when appropriate we attempt to harmonize civil and criminal jurisprudence, looking to the criminal law to determine similar or corresponding issues in civil law. *Johnson*, 23 S.W.3d at 11; *e.g.*, *In the Matter of C.M.G.*, 905 S.W.2d at 58. Therefore we look to criminal jurisprudence about when jury unanimity is required regarding fact issues.

In *Francis v. State*, 36 S.W.3d 121 (Tex. Crim.App.2000), Francis was indicted on a single count of indecency with a child. The statute reads:

A person commits an offense if, with a child younger than 17 years and not his spouse, whether the child is of the same or opposite sex, he: (1) engages in sexual contact with the child . . .

TEX. PEN. CODE ANN. § 21.11 (Vernon Supp. 2001).

"Sexual contact" means any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person.

TEX. PEN. CODE ANN. § 21.01(2) (Vernon 1994). At trial, the State presented evidence of four distinct incidents of alleged indecency, each occurring on different dates: two committed by touching the child's breast and two by touching her genitals. At the close of the evidence, Francis requested that the State be made to elect to proceed on only one of the four incidents. The State argued that the jury should be asked whether Francis "engag[ed] in sexual contact by touching the breast or genitals of [victim]." The court granted the State's request. *Francis*, 36 S.W.3d at 122. On appeal, Francis complained that the jury could have split on which of the two alleged acts of indecency he may have committed, resulting in a verdict which was not unanimous.

Central to its disposition of the case was the Court of Criminal Appeal's distinction between submitting to the jury in the disjunctive (1) alternate theories of how a single offense was committed, and (2) two separate offenses. *Id.* at 124. For the charge to have been correct, the court reasoned, there must have been evidence of a single incident in which Francis may have touched both the breast and the genitals of the victim. *Id.* Because that was not so, the breast-touching and the genital-touching were two separate offenses, occurring on separate dates. Consequently,

---

**16.** It is entirely possible that through proper instructions the charge could require the jury to render a verdict assuring that ten or more jurors agreed on which, if any, statutory grounds occurred, and in which the ultimate questions to the jury are in broad-form.

it is possible that Francis was convicted by less than twelve jurors who believed he touched the victim's breast but not her genitals on a single occasion, or by less than twelve jurors who believed he touched the victim's genitals but not her breast on that occasion. The judgment was reversed.

The court distinguished *Kitchens v. State*, 823 S.W.2d 256 (Tex.Crim.App. 1991). In that case—a death-penalty case—Kitchens was charged in a one-count indictment with capital murder. In two separate application paragraphs, it was alleged he committed the murder in the course of aggravated sexual assault and also in the course of robbery. Kitchens complained because the jury was not required to agree unanimously whether he committed the murder in the course of the assault or in the course of the robbery. The Court held: "It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted." *Id.* at 258. "[T]here is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." *Id.* (citing *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)).

### Application

■ The question for us is: Is this a *Francis* case or a *Kitchens* case? Asked another way, are the two grounds on which the State seeks to terminate Spring's and Jimmy's rights more like separate offenses or more like different ways of committing a single offense? Section 161.001 lists nineteen grounds for termination. Several of these grounds, including the allegations against Spring and Jimmy, can be proved by evidence of one or more separate incidents of conduct. For example, a parent may have "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child" on six different occasions spread over a year. TEX. FAM. CODE ANN. § 161.001(D) (Vernon Supp.2001). Nevertheless, each ground is conceptually different, and evidence sufficient to prove one is not necessarily sufficient to prove another.

The grounds alleged against Spring and Jimmy are in subsections "D" and "E" of section 161.001. Subsection "D" requires that:

1. The parent "[k]nowingly placed ... the child ... in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child," *or*

2. "the parent ... knowingly allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child."

Subsection "E" requires that:

1. The parent "engaged in conduct ... which endanger[ed] the physical or emotional well-being of the child," *or*

2. "the parent ... knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child."

The statutory purpose for "D" and "E" focuses on different types of acts or omissions on which termination can be based: "D" relates to "conditions or surroundings," while "E" relates to "conduct." Otherwise, the subsections would be redundant and would not have been set forth separately. Evidence sufficient to prove one is not necessarily sufficient to prove another. We conclude that these two grounds are more like separate offenses in the criminal law than different means. To comport with due process, they cannot be submitted in the disjunctive, at least not without sufficient instructions to require

the jury to agree by ten or more jurors which ground, if any, was committed by each parent with respect to each child. *Contra Matter of Marriage of Hill,* 893 S.W.2d 753, 755–56 (Tex.App.—Amarillo 1995, writ denied).

■ Because it is possible under the evidence in this case that less than ten jurors found that any of the statutory grounds for termination occurred, harm is presumed. This conclusion is supported by the decision in *Crown Life,* 22 S.W.3d at 387–90. As previously discussed, in *Crown Life,* the trial court submitted a broad-form liability question to the jury which mixed different theories of liability, some of which were invalid because the plaintiff lacked standing. The Court found error and stated: "When a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Id.* at 388. "[W]hen the trial court is unsure whether it should submit a particular theory of liability, separating liability theories best serves the policy of judicial economy underlying Rule 277 by avoiding the need for a new trial when the basis for liability cannot be determined [on appeal]." *Id.* at 390. *See* TEX. R. APP. P. 44.1(a) ("No judgment may be reversed on appeal . . . unless the error complained of . . . probably prevented the appellant from properly presenting the case to the court of appeals."). The statutory grounds for termination are comparable to legal theories in a civil trial for damages. The appellate court must be able to review which grounds were found by ten or more jurors. When that cannot be done, the error is "reversible".

Spring's and Jimmy's seventh issue is sustained.

## OTHER ISSUES

Because of our resolution of issues one and seven, we do not reach Spring's and Jimmy's other issues.

## CONCLUSION

Spring and Jimmy did not receive effective representation of counsel at trial because their attorney had an actual conflict of interest which adversely affected his performance. In addition, because of the wording of the charge, they have been deprived of a jury verdict that assures that at least ten jurors agreed on the grounds for termination. Therefore, the judgment is reversed, and the cause is remanded for a new trial. On retrial, jurors should be instructed that to answer "yes" to a broad-form termination question concerning a particular parent and a particular child, ten or more jurors must agree that that parent committed at least one of the statutory grounds for termination regarding that child, and the same ten must agree that termination of that parent's rights is in that child's best interest. Alternatively, individual questions as to each ground for terminating and best interest as to each child may be submitted if broad-form submission is not feasible.

GRAY, Judge, dissenting.

## SEPARATE TRIALS VERSUS SEPARATE COUNSEL

The majority simply recast trial counsel's motion for separate trials as a motion for separate counsel on appeal. They also allow the Dosseys to engraft an ineffective assistance of counsel issue onto the newly cast issue on appeal. This is improper and I cannot join in it. Justice and due process do not require it.

At trial, counsel made numerous arguments why his clients should have separate

trials. The motion was denied. The same counsel, now on appeal, no longer argues that issue. The record and the briefs do not reflect why there has been a change in strategy. Whatever the reason, the Dosseys have not argued that the trial court erred in failing to allow separate trials. Review of that decision was the process that was due them under the facts and circumstances of this case. Because the appellate argument does not conform to the motion urged at trial, nothing is presented for our review. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997); *Texas DOT v. Olson,* 980 S.W.2d 890, 898 (Tex. App.—Fort Worth 1998, no pet.).

Essentially, the majority has determined that as a matter of law, trial counsel violated his ethical responsibility to not represent clients with conflicting interests at trial.[1] This is a civil proceeding. In a civil proceeding, clients may consent to conflicts of interest created by joint representation provided the consent is obtained after full disclosure. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.06(b) & (c), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit.G app. A (Vernon 1998); *see also FDIC v. United States Fire Ins. Co.,* 50 F.3d 1304, 1314 (5th Cir.1995). The parties may have decided that their interests were best represented by a single attorney presenting a comprehensive and consistent picture. In this case, the parties clearly consented to joint representation on the record. We should not second-guess the parties' and their attorney's trial strategy of joint representation but requesting separate trials. The trial court was never asked to appoint separate trial counsel and therefore, did not err by failing to do so.

## BROAD FORM SUBMISSION

As for broad form submission, again, this is a civil proceeding, not criminal. Without determining that any ground submitted for termination was improper, or not supported by sufficient evidence to support the jury verdict on that issue, the majority simply applies the standard for criminal charges. This too is improper, and I cannot join it.

If the Dosseys' ability to present the issue on appeal was adversely affected by the broad form submission, and if a timely objection thereto had been raised, the result may be justified. But the real question here is whether it is necessary, in a civil termination suit, for ten jurors to all agree on the same ground for termination. I do not believe the statutes, the rules of procedure, or due process require it.

In a termination proceeding, there is a constant balancing of the parents' rights against society's determination of the best interest of the child. The parents' right is to have children and raise them according to their own ideas, with the means available to them, in a manner they deem appropriate. Our society has determined that the parents' rights are not unlimited and must conform to a general notion of what is in the best interest of a child. The legislature has very carefully specified what conduct of the parent can result in termination of the parents' rights. This has been referred to as a "predicate act" for termination. *See In re J.M.T.,* 39 S.W.3d 234, 238 (Tex.App.—Waco 1999, no pet.). But the jury must also determine that termination of those rights are in the best interest of the child.

I do not believe that due process necessarily requires ten jurors to agree on

---

1. Further, they reward that attorney, and his clients, by allowing the appellate attorney to skirt the ethical issue on appeal, holding that

it is acceptable for that same attorney to represent both of them on appeal.

which predicate act has been violated. As long as ten jurors agree that one of the predicate acts alleged and proved was violated, the statute has been complied with.

Finally, the due process argument regarding broad form submissions in a termination case has been considered and summarily rejected by the Supreme Court. *Texas Dept. of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990). The Dosseys have not brought themselves within the *Crown Life* exception because they have not shown that any theory submitted to the jury was "an improperly submitted invalid theory." *Crown Life Ins. v. Casteel*, 22 S.W.3d 378, 388 (Tex.2000). We fly in the face of existing Texas Supreme Court precedent on this issue by holding to the contrary.

### AFFIDAVITS OF JURORS

While we have recently held that we cannot consider the affidavit of a juror regarding what affected their deliberations, the majority quotes a juror's affidavit and relies on it to reverse the trial court's judgment. *See Tucker v. Interstate Brands Corp.*, No. 10–98–333–CV (Tex.App.—Waco April 4, 2001, not designated for publication). This is improper. *See* TEX. R. EVID. 606(b). Further, it encourages others to use improper means to influence this Court. This type evidence has no place in an appeal and should be consistently disregarded and condemned. This specific affidavit is especially troubling because the subject of the affidavit is arguably the type considerations that a jury should make, particularly as it may relate to the best interest of the child. Additionally, it evidences a weighing of the testimony of the witnesses and their credibility. If the jury collectively, or an individual juror, believed that Spring had endangered the children by leaving them with Jimmy, that is a predicate act. Fur-

ther, if they did not believe that she would in fact leave Jimmy if they terminated only his parental rights and thus he would still be in a position to affect the children's physical or emotional health, they could have properly determined that it was in the best interest of the children to terminate her rights as well. Thus, even if the affidavit could be considered, which it cannot, it does not support the conclusions reached by the majority.

### CONCLUSION

For the reasons expressed herein, I respectfully dissent.