TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-03-00273-CV




Vanessa Carr, Appellant

v.

Texas Department of Protective and Regulatory Services, Appellee





FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. FM107107, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING




M E M O R A N D U M O P I N I O N


                        Appellant Vanessa Carr appeals from the trial court’s final decree terminating her
parental rights to her three children, K.C., D.B., and J.T.C., entered following a jury trial. We affirm
the district court’s judgment.

Sufficiency of the Evidence
                        In her third issue, Carr contends the evidence is legally and factually insufficient to
support the jury’s verdict that her parental rights should be terminated and that there is insufficient
evidence to support any of the grounds put forth by the State. The jury charge stated that for Carr’s
parental rights to K.C. and D.B. to be terminated, the jury must find by clear and convincing
evidence that Carr had (1) knowingly placed or allowed the children to remain in conditions that
endangered the children, (2) engaged in conduct or knowingly placed the children with people who
engaged in conduct that endangered the children, (3) constructively abandoned the children for at
least six months, or (4) failed to comply with a court order setting out actions necessary for the
children’s return. With regard to Carr’s parental rights to J.T.C., the charge stated that Carr’s rights
could only be terminated if there was clear and convincing evidence that she had (1) knowingly
placed or allowed J.T.C. to remain in conditions that endangered her, or (2) engaged in conduct or
placed J.T.C. with persons who engaged in conduct that endangered her.

Standard of Review
                        A trial court may terminate a parent-child relationship if it finds that the parent has
engaged in any of the conduct set out as statutory grounds for termination and that termination is in
the child's best interest; the Department must establish these elements by clear and convincing proof.
Tex. Fam. Code Ann. § 161.001 (West 2002); In re C.H., 89 S.W.3d 17, 23 (Tex. 2002). Clear and
convincing evidence is an intermediate standard of proof falling between proof beyond a reasonable
doubt and the preponderance of the evidence. C.H., 89 S.W.3d at 23-25. The clear-and-convincing
standard requires a “degree of proof which will produce in the mind of the trier of fact a firm belief
or conviction as to the truth of the allegations” supporting termination. Id. at 23 (quoting State v.
Addington, 588 S.W.2d 569, 570 (Tex. 1979)). We review the legal sufficiency of the evidence by
considering “all the evidence in the light most favorable to the finding to determine whether a
reasonable trier of fact could have formed a firm belief or conviction that its finding was true.” In
re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We must maintain appropriate deference to the fact
finder by assuming that it resolved evidentiary conflicts in favor of its finding when reasonable to
do so; we disregard evidence that a reasonable fact finder could have disbelieved or found incredible.
Id. We review factual sufficiency by viewing all the evidence and deciding whether a reasonable
fact finder could have resolved disputed evidence in favor of its finding. Id. If, after such a review,
the disputed evidence is such that a reasonable fact finder could not have formed a firm belief about
the truth of the State’s allegations, the evidence is factually insufficient. Id.; C.H., 89 S.W.3d at 25. 

Summary of the Evidence
                        Carr was almost twenty-one years’ old at the time of trial in April 2003, K.C. was six,
D.B. was three, and J.T.C. was almost five months’ old. K.C. was taken into protective Department
custody in October 2001, D.B. was taken into protective custody in about June 2002, and J.T.C. was
taken into custody in early December 2002 when she was about two weeks’ old. Carr became
pregnant with K.C. when she was thirteen years’ old, as a result of a rape by Kenneth Terrell, a close
family friend referred to as a godfather and a stepfather. Terrell first sexually assaulted Carr when
she was about eleven years’ old, but her family, including her mother, refused to believe that she had
been assaulted until she became pregnant with K.C. Terrell was convicted of sexual assault and was
in prison at the time of Carr’s termination trial.
                        In 1998 Carr was referred to the Department because she let Terrell’s wife babysit
K.C. although Terrell’s wife had seven referrals to the Department, largely based on allegations of
substance abuse. Carr was again referred to the Department in October 2001 because her mother,
Sheryl Johnson, stated that she was K.C.’s primary caretaker at a juvenile court proceeding during
which she and Carr’s fifteen or sixteen year-old brother both appeared to be intoxicated and tested
positive for crack cocaine. Carr and K.C. were living with her mother and brother at the time, and
K.C. shared a room with Carr’s teenaged brother. K.C. appeared to be on target developmentally
and did not show signs of mistreatment when taken into Department custody. There was testimony
that when the Department attempted to locate D.B., Carr said that she did not know where he was
and then that he was with Marcus Williams


 but that she did not have contact information for
Williams. D.B. was eventually removed from Williams due to drug abuse and marital discord in the
home; he was then placed in the same foster home with K.C.
                        Celeste Richmond, Carr’s caseworker, stated that Carr’s service plan required her to
complete a parenting class and a psychological exam, obtain and maintain employment, and keep
the Department notified of any change of address or telephone number. The Department provided
Carr with basic household supplies and clothing appropriate for an interview. Richmond said that
initially Carr’s apartment was appropriate. However, as time went on, it was clear that “someone
was smoking marijuana, and a lot of it, in that apartment.” When asked, Carr said her guests were
smoking, not Carr herself. Carr was instructed not to allow marijuana smoking in her apartment.
                        Richmond testified that in December 2001, Carr was first instructed to stop all drug
use and was told that future visits with her children would be contingent on clean drug tests. The
State introduced evidence that at least five drug tests from early 2002 indicated marijuana use and
one also showed cocaine use. In January 2002, Richmond started canceling Carr’s visits because
of positive drug tests. Richmond occasionally allowed visitation when Carr’s test results were not
back, and at least once mistakenly allowed visitation in spite of a positive test result. When a test
indicated cocaine use, Carr denied using cocaine, saying she was taking a prescription for headaches. 
However, according to the drug lab, such medication usually tests as amphetamine and does not give
a false positive for cocaine. 
                        Richmond said that although Carr initially seemed very interested in completing the
service plan, making changes in her life, and being reunited with her children, Carr’s behavior grew
less and less cooperative. Richmond said Carr sometimes did not come to scheduled visits with
K.C., which distressed K.C. Carr also missed several scheduled appointments for a psychological
exam, and did not complete the exam until October 2002, almost a year after it was ordered. After
Carr failed successive drug tests and had visitations cancelled, she eventually stopped contacting
Richmond; Carr did not see her two oldest children after February 2002, and her phone was
disconnected in April. When D.B. was moved into the same foster home as K.C., Richmond had
to send Carr a letter informing her of the changes, stating that she had tried several times to call Carr
and had also left messages at Carr’s mother’s house. Carr had not obtained or maintained
employment, nor had she completed the court-ordered drug assessment, attended psychological
therapy, finished inpatient drug treatment, or completed a court-ordered parenting class.


 Richmond
said Carr never provided a clean drug test. Richmond last saw Carr in December 2002 at J.T.C.’s
removal hearing, and Carr never contacted Richmond to try to arrange a visit with J.T.C.
                        On November 25, 2002, the Department was contacted because at her birth, J.T.C.
tested positive for marijuana and weighed only four pounds, five ounces. The Department could not
find J.T.C. until she was about two weeks’ old because Carr had placed J.T.C. with her friend, Sheri
Milligan. When J.T.C. was found, she had lost weight because Milligan had been using regular
bottles instead of bottles designed for premature babies and weighed three pounds, twelve ounces. 
Richmond was very concerned about J.T.C. because she was tiny when she was born, and then lost
weight during her placement with Milligan. Carr wanted J.T.C. placed with Milligan, but Milligan
cancelled that process midway through because she was having personal problems; Richmond also
said Milligan’s fiancé had an open case with the Department.
                        Richmond said the initial goal was to reunite Carr with her children. However, that
goal changed due to Carr’s continued drug abuse and emotional and mental health issues. Richmond
did not believe Carr could be an adequate parent until she addressed those problems. Richmond
believed that Carr had endangered D.B. and K.C. by leaving the children with inappropriate care
givers, including her mother, Williams, and, when K.C. was an infant, Terrell’s wife. Richmond
believed Carr was a danger to J.T.C. because J.T.C. tested positive for drugs at birth; Carr continued
to make poor decisions such as leaving J.T.C. with a person who had a “history” with the
Department and with whom J.T.C. lost weight because of improper feeding.
                        Dr. John Gould performed Carr’s psychological exam in October 2002. He testified
that Carr suffered from severe depression, anxiety, and post-traumatic stress disorder, and expressed
suicidal thoughts, mostly associated with the possibility of losing her children, and homicidal
thoughts toward her Department caseworker. Dr. Gould recommended that Carr take psychotropic
and antidepressant medications and undergo therapy, substance abuse treatment, and parenting
classes. Dr. Gould did not believe that, as of October, Carr was psychologically or emotionally
capable of caring for her three young children, and said she would need assistance, treatment, and
medication to do so. 
                        When K.C. was five and D.B. was two, the children were referred to a therapist
because they were throwing severe temper tantrums and acting out sexually and K.C. was lying and
being manipulative.


 Tania Glenn, their therapist, said her sessions with K.C. were notable because
of the “severe sexual overtone.” K.C. talked about oral sex during therapy, saying Carr had engaged
in such acts in front of her. K.C. grew angry and upset when she discussed the subject, and often
used very vulgar words during therapy. Glenn also said that K.C. described Carr’s drug use to her
foster mother, although the subject did not come up in therapy. Glenn knew K.C.’s foster mother,
and did not believe K.C. had learned her sexual behavior in the foster home because she had been
in that home for a very short amount of time when she began acting out and her foster mother did
not allow men in the house and would never use such graphic language. Glenn stated that K.C. had
not bonded with her mother properly and suffered from post-traumatic stress disorder, but that her
behavior and language had improved as she worked through her traumatic memories. Glenn said
both children needed a very structured, consistent, loving, patient environment with parents who
could provide for their needs and give supervision. She believed that continued contact with Carr
would be harmful to K.C. and D.B. because they have very negative thoughts about her, have not
expressed any desire to see her, and would be afraid if they did see her. Glenn testified that it was
in the children’s best interests that Carr’s parental rights be terminated.
                        Austin police officers testified that neighbors and passers-by complained about drug
dealing at Carr’s apartment. Carr was frequently seen with drug dealers, and was arrested in July
2002 for drug possession while she was pregnant with J.T.C. During one search of her apartment,
police officers found crack cocaine and marijuana; Carr denied that the cocaine was hers. During
another search, “[a] large cloud of marijuana smoke came rushing out as soon as they opened the
door”; newborn J.T.C. was in the apartment at the time.
                        Carr denied ever being sexually active in front of her children. She said K.C. may
have seen sexual behavior on television because she would sometimes turn on the cable channels
late at night. Carr never saw K.C. or D.B. act out sexually and never got reports from school or
relatives of inappropriate behavior.
                        Carr admitted that she was informed that she had to take a drug test before she visited
her children, but denied being told that she had to stop using drugs. Carr said her caseworker kept
telling her that the drug tests were clean and did not understand why the Department would have
allowed her to see her children if her tests were positive. Carr denied using crack cocaine, and said
she never used drugs or even smoked cigarettes in front of her children. Carr testified that when she
found out she was pregnant with J.T.C., she stopped smoking marijuana, and said J.T.C. tested
positive for marijuana because there was only one umbilical artery. Carr also testified that she had
stopped using marijuana only three weeks before trial. Carr said she placed J.T.C. with Milligan
because she did not want the State to be able to say J.T.C. was in an unsafe environment. 
                        Carr testified that she struggled with depression while pregnant with D.B., sought
treatment, and was prescribed medication. However, she discontinued the medication because it did
not help and made her sleepy. She stopped taking her medication altogether when she got pregnant
with J.T.C. Carr said she still suffers from depression at times. She denied ever saying she had
suicidal thoughts. Carr completed two weeks of a four-week drug treatment program, but stopped
because of family problems.
                        Carr testified that she had not found employment since the children were removed,
but she said she had looked for work and filled out many applications. She does not have a high
school diploma or a GED certificate, and said she had not found a program that would help her get
her GED. Carr said she complained to her apartment manager about the drug activity around her
apartment, but was told it was the only apartment available. At the time of trial, Carr did not have
a job, was getting food stamps, and was getting help from her mother to pay her utilities. However,
she said if she had her children, “it would be a whole another different story,” and she would get a
job to support them or find money somehow, saying “I can get money from anywhere.” Carr said
she stopped contacting the Department because she had a personality conflict with Richmond. Carr
said, “I have no excuse for not completing my service plan, you know. I did some of it. I didn’t do
some of it. I’m sorry. . . . [I]t seemed like every time I did something it wasn’t right. It wasn’t good
enough.” Carr said she loved her children and would be able to support them somehow. She also
said she would be sure that they attended and succeeded in school.

Discussion
                        The evidence in this cause is legally and factually sufficient for a reasonable trier of
fact to form a firm conviction that Carr’s parental rights should be terminated based on any of the
alleged grounds. There was evidence that Carr, who suffers from depression, went off her
medication and had suicidal and homicidal thoughts. There was evidence that she frequently smoked
marijuana and allowed her infant to stay in an apartment filled with marijuana smoke. K.C.’s
therapist testified that K.C. reported seeing her mother engaged in sexual activity and drug use, and
stated she did not believe that K.C. learned vulgar words or sexual behavior in her foster home.
While Carr’s children were out of her custody and she was supposed to be taking parenting classes
and getting counseling, she continued to abuse marijuana and tested positive for cocaine on one
occasion. Carr dropped out of her drug treatment program and waited for nearly a year before
completing the court-ordered psychological exam. Dr. Gould did not believe Carr could be an
adequate parent until she obtained counseling, and Richmond believed Carr was a danger to her
children because Carr continues to make poor choices and use drugs. Although Terrell sexually
abused Carr as a child and Terrell’s wife had numerous referrals to the Department for substance
abuse, Carr allowed Terrell’s wife to babysit K.C. and even allowed her to attend K.C.’s birthday
party after she had kidnapped K.C. in an attempt to get Carr to recant her allegations of sexual abuse. 
Carr’s mother appeared in court high on cocaine, accompanied by Carr’s teenaged brother, who was
also high on cocaine, and told the court she was K.C.’s primary caretaker. Carr placed her newborn
with a friend who did not use the right bottles to feed her, resulting in a weight loss for the tiny
infant; that friend’s fiancé had an open Department case pending. Finally, Carr essentially ceased
contact with the Department in February 2002, and did not see her older children for more than a
year. It was for the jury to hear the evidence and disregard evidence that a reasonable fact finder
could have disbelieved or found incredible. We cannot hold that the evidence is insufficient to
support the jury’s verdict. We overrule Carr’s third issue on appeal.

Jury Charge
                        In her first issue on appeal, Carr contends that the jury charge, which included
multiple grounds for termination in one broad-form question, violated Carr’s right to procedural due
process because it did not (1) require the jury to identify the grounds for termination or (2) require
that ten jurors agreed on any one ground for termination. In her second issue, she contends that the
multiple-issue question violates section 161.001 of the family code and could subject her and other
parents in similar circumstances to erroneous termination of parental rights to future-born children.
                        Although the jury charge stated that Carr’s parental rights to K.C. and D.B. could be
terminated if clear and convincing evidence established one of four grounds for termination, the
charge asked in a broad-form question simply whether Carr’s rights to K.C. and D.B. should be
terminated. Likewise, with regards to J.T.C., the charge allowed for Carr’s rights to be terminated
based on two grounds, but asked simply whether Carr’s rights to J.T.C. should be terminated. To
both broad-form questions, the jury answered “yes.” In the charge’s general instructions, the jury
was instructed that “[t]he same ten or more of you must agree upon all the answers made and to the
entire verdict.”
                        Carr argues that the broad form submission improperly lowered the State’s burden
of proof and made it impossible to be sure on which ground ten or more jurors agreed. Carr
acknowledges that in Texas Department of Human Services v. E.B., the supreme court approved of
the use of broad-form questions in termination cases. 802 S.W.2d 647, 649 (Tex. 1990). She
contends, however, that E.B. must be harmonized with the more recent decision in Crown Life
Insurance Co. v. Casteel, in which the supreme court held that it is harmful error to submit to a jury
a single broad-form question that “commingles valid and invalid liability theories.” 22 S.W.3d 378,
389 (Tex. 2000). Carr argues that the grounds for termination are analogous to damages theories. 
She contends that because the evidence is insufficient to support the jury’s findings as to each of the
asserted grounds, allowing the jury to find that her parental rights should be terminated without
determining on which ground or grounds the jury relied violates her rights to due process because
the termination may be based on a ground that lacks evidentiary support. As authority, Carr points
us to the Waco Court of Appeals’s decision in In re B.L.D., 56 S.W.3d 203, 218-19 (Tex.
App.—Waco 2001), rev’d, 113 S.W.3d 340 (Tex. 2003). Carr acknowledges that B.L.D. was
reversed by the supreme court. However, the supreme court reversed because the alleged error was
not preserved and did not address the merits of the Waco court’s reasoning. See 113 S.W.3d at 349-55. Carr therefore urges us to follow the logic of the Waco court in this case in which error was
preserved by proper objection and argument at trial.
                        As the Waco court stated, “The question is, for what facts in a termination case does
due process require agreement among the jurors?” B.L.D., 56 S.W.3d at 217. The supreme court
did not reach that question because the issue was not preserved. Carr argues that E.B., when
harmonized with Casteel, allows us to hold that due process requires all ten jurors to agree on the
grounds for termination in addition to finding that the parental relationship should be terminated. 
However, we have held that sufficient evidence supports each of the grounds for termination of
Carr’s parental rights to her children. Therefore, no invalid theories were submitted, as they were
in Casteel. See 22 S.W.3d at 389. The supreme court in E.B. stated:

The charge in parental rights cases should be the same as in other civil cases. The
controlling question in this case was whether the parent-child relationship between
the mother and each of her two children should be terminated, not what specific
ground or grounds . . . the jury relied on to answer affirmatively the questions posed. 
All ten jurors agree that the mother had endangered the child by doing one or the
other of the things listed in [the termination statute]. . . . The standard for review of
the charge is abuse of discretion, and abuse of discretion occurs only when the trial
court acts without reference to any guiding principle. Here the trial court tracked the
statutory language in the instruction and then asked the controlling question. This
simply does not amount to abuse of discretion.
 
 
802 S.W.2d at 649.
                        Only the supreme court may revisit the issue and hold that in termination cases due
process requires that the same ten jurors must agree on the ground or grounds to support termination
of parental rights. Absent such guidance from the supreme court, we may not depart from E.B.’s
clear holding that broad form submissions such as the one in this case are proper, Casteel
notwithstanding. See, e.g., In re J.M.M., 80 S.W.3d 232, 249-50 (Tex. App.—Fort Worth 2002, pet.
denied); In re K.S., 76 S.W.3d 36, 48-49 (Tex. App.—Amarillo 2002, no pet.); see also Cox v. Texas
Dep’t of Protective & Regulatory Servs., No. 03-01-00511-CV, 2002 Tex. App. LEXIS 3651, at *7
n.3 (Austin May 23, 2002, pet. denied) (not designated for publication) (holding that Casteel does
not apply in cases where disjunctive allegations track statutory language, as charge does in this
cause). We overrule Carr’s first issue on appeal.
                        As for Carr’s second issue, we have held that sufficient evidence supports the
termination of her parental rights to K.C. and D.B. based on findings under section 161.001(1)(D)
or (E), that she either engaged in conduct or knowingly allowed her children to remain in conditions
or with persons who engaged in conduct that endangered the children. See Tex. Fam. Code Ann.
§ 161.001(1)(D), (E). Such grounds could later allow for the termination of Carr’s rights to future
children under subsection (M), which provides for termination if parental rights have been
terminated with respect to another child based on subsections (D) or (E). See id. § 161.001(1)(M). 
Furthermore, Carr’s rights to J.T.C. were terminated based only on subsections (D) or (E). 
Therefore, should the Department seek in the future to terminate Carr’s rights to other children based
on subsection (M), such termination would not be erroneously based on a subsection other than (D)
or (E). We overrule Carr’s second issue.
                        We affirm the district court’s judgment.
 
 
                                                                        __________________________________________
                                                                        Jan P. Patterson, Justice
Before Chief Justice Law, Justices B. A. Smith and Patterson
Affirmed
Filed: January 8, 2004