

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-15-00025-CV

_____

IN THE INTEREST OF D.G., K.G., H.M.G., CHILDREN

On Appeal from the County Court at Law No. 1
Gregg County, Texas
Trial Court No. 2014-0872-CCL1

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

After many years of abusing controlled substances, Becky and Bill lost their parental rights to their young children, D.G., K.G., and H.M.G.,[1] as the outcome of a jury trial in Gregg County. On appeal, Becky and Bill argue (A) that the evidence is legally and factually insufficient to support the finding that termination was in the best interests of the children, (B) that it was error to deny a mistrial after alleged juror misconduct, (C) that it was error to disallow cross-examination of the allegedly offending juror, (D) that it was error to not instruct the jury panel and jury with the instructions required by Rule 226a,[2] and (E) that it was error to submit a broad form issue that encompassed in a single issue both the statutory grounds for termination and the best interests of the children. We affirm the judgment of the trial court because (1) sufficient evidence supports the best-interest finding, (2) neither mistrial nor cross-examination of the juror was required, (3) any error in failing to give the instructions required by Rule 226a was waived, and (4) no jury-charge error was preserved.

*(1)    Sufficient Evidence Supports the Best-Interest Finding*

Texas courts have historically shown great respect for the biological bond between parent and child, recognizing that "'[t]he natural right which exists between parents and their children is one of constitutional dimensions.'" *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). Indeed, parents have a fundamental right to

---

[1]We will refer to appellants as "Becky" and "Bill" and the children as "D.G.," "K.G.," and "H.M.G." *See* TEX. R. APP. P. 9.8. When the children were removed in May 2014, D.G. was eight, K.G. was seven, and H.M.G. was three years old.

[2]*See* TEX. R. CIV. P. 226a. Although the briefs of Becky and Bill cite this rule as "Rule 222a," it is Rule 226a of the Texas Rules of Civil Procedure that prescribes the instructions required to be given to the jury panel and jury.

make decisions concerning "the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial." *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014). This Court is therefore required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* at 500. "'[I]nvoluntary termination statutes are strictly construed in favor of the parent.'" *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (quoting *Holick v. State*, 685 S.W.2d 18, 20 (Tex. 1985)).

To terminate parental rights, the fact-finder must find, by clear and convincing evidence, that the parent has engaged in at least one statutory ground for termination[3] and that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West 2014); *In re E.N.C.*, 384 S.W.3d 796, 798 (Tex. 2012). "Clear and convincing evidence" is that "degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *see In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). This standard of proof necessarily affects our review of the evidence.

In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex.

---

[3]Becky and Bill do not challenge the sufficiency of the evidence supporting the finding that they engaged in at least one statutory ground for termination.

3

2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.).  We assume the jury, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted.  *J.P.B.*, 180 S.W.3d at 573.

In our review for factual sufficiency of the evidence, we give due consideration to evidence the jury could have reasonably found to be clear and convincing.  *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam).  We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine if, from the evidence, the fact-finder could have reasonably formed "'a firm belief or conviction about the truth of the . . . allegations.'"  *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)).  "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."  *J.F.C.*, 96 S.W.3d at 266.  "[I]n making this determination," we must undertake "'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'"  *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

Despite the profound constitutional interests at stake in a proceeding to terminate parental rights, "'the rights of natural parents are not absolute; protection of the child is paramount.'"  *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *J.W.T.*, 872 S.W.2d at 195; *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)).  "A child's emotional and physical interests must not be sacrificed

4

merely to preserve parental rights." *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.) (citing *C.H.*, 89 S.W.3d at 26).

We turn to the evidence in the record relevant to the best-interest finding.

Before the removal of the children in this case in April 2014, Becky and Bill had been investigated by the Texas Department of Family and Protective Services (the Department) on two other occasions, each involving the parents' use of illegal substances. In 2007, when K.G. was born, Becky reported to hospital personnel that she had been smoking marihuana, had used cocaine within the last two weeks, and had taken a pain pill supplied by a friend, all while pregnant with K.G. At that time, the Department sent her for an evaluation, which resulted in her entering outpatient treatment for substance abuse. Becky completed the drug rehabilitation services provided by the Department, and the Department ended its involvement. After eight months, Becky began smoking marihuana again and continued smoking it daily until H.M.G. was born in 2011. When H.M.G. was born, both he and Becky tested positive for marihuana, and the Department began providing drug rehabilitation, parenting classes, and family and individual counseling to Becky and Bill. Becky and Bill completed these services, and the Department again terminated its involvement. Becky testified that she then began using alcohol, and, eventually, methamphetamine. She said that she smoked methamphetamine in her house while her children were present, although she denied smoking in front of them.

In April 2014, the Department received a report of possible neglect of the children and illegal drug use by Becky and Bill. At the time, Bill was incarcerated.[4] In an initial investigation on April 14, Linda Womack, an investigator for the Department, found Becky at her house in Gladewater with H.M.G. Although H.M.G. was dirty, it appeared to be from his playing outside. She determined that the utilities were working and that there were no immediate safety hazards in the house, other than cigarette butts scattered about the house. Womack was concerned that some of Becky's relatives were also there to move Becky's grandfather, who was her main source of support, away from the house. She was also concerned that Bill's cousin, Curtis, was also present at the house. Womack knew that the Department had opened a case against Curtis because of his illegal drug use and neglect of his children. After Becky agreed to a drug test, Womack left. Womack was not able to locate Becky again until April 25, when she again found her at her house in Gladewater with K.G. and H.M.G. At that time, they discussed Becky's current drug usage; Becky admitted that she might have trace amounts of marihuana in her system.

As a result of Becky's drug test, Womack concluded that Becky's drug usage placed the children in immediate danger.[5] After filing a petition requesting immediate removal on May 1, 2014, Womack removed the children from the home. She testified that, on the day of removal, the children had dirt caked on them, wore dirty clothes, and appeared to not have bathed for a couple of days. She also said that, when she saw them before that day, they appeared to be clean.

---

[4]The evidence shows that Bill has two convictions for assault causing bodily injury to a family member, a conviction for felony burglary of a building, and a conviction for theft over $500.00. At the time of the final hearing, Bill was incarcerated, having been arrested for aggravated robbery and being a felon in possession of a firearm.

[5]Although not in evidence, Womack's affidavit attached to the petition for removal indicates that Becky tested positive on April 25 for marihuana, methamphetamine, and amphetamine.

At trial, Becky admitted that her children tested positive for methamphetamine and attributed this to secondhand smoke resulting from the lack of doors inside her house. Becky testified that she used methamphetamine daily, until she began to try to get off the drug after this case began. Even then, she acknowledged telling Dr. Donald Winsted, III, a licensed psychiatrist, that she had used methamphetamine every other day and marihuana every day until late December, 2014. Nevertheless, at trial, she asserted that, after her inpatient treatment, she had stopped using these drugs, except for a couple of relapses.

Becky completed seventeen days of an inpatient treatment program in August 2014.[6] She testified that her counselor wanted her to go to an outpatient program and to attend Alcoholics Anonymous (AA) meetings, but that she only attended six or seven AA meetings. In January or February 2015, Becky began an outpatient drug treatment program called Beginnings.[7] Becky admitted that she used marihuana one time after starting the outpatient program. Becky explained that she returned to drug use after completing the drug rehabilitation programs in 2007 and 2011 because she needed help and she did not understand the seriousness of her drug use. In trying to explain her continued periodic use of illegal drugs after attending the 2014 program, Becky stated, "[E]verybody has relapses."

---

[6]Although Becky testified that she completed the inpatient program, Dionne Jordan, the Department's caseworker, testified that the inpatient program usually lasts twenty-eight to thirty days. The certificate of completion introduced by Becky merely states that she "successfully completed 17 days of the Adult Women Residential Treatment Program."

[7]Trisha Thompson, a licensed chemical dependency counselor intern with Beginnings, testified that Becky had completed seventy-five percent of her treatment program at the time of trial.

Becky testified that, at the time of trial, she was living with Bill's mother in an apartment in Longview.[8] When asked how long she had lived there, she simply said "off and on." She testified that, although it is a small apartment, if the children were returned to her, they would live with her and Bill's mother in the apartment. However, she also testified that she is taking care of Bill's mother, who had just returned home from having a leg amputated. She testified that she is paid by Outreach Services to cook and clean four hours a day for Bill's mother. She claimed that she is looking for other clients to whom she could provide these same services. The only other income Becky has had during the pendency of the case was from working at Fred's for a short time in the summer of 2014, where she brought home a total of $356.00, and from cleaning houses. She admitted that she has not made any child support payments as required under the trial court's temporary order.

Becky explained that, although she and the children had been living in a four-bedroom house in Gladewater when the children were removed, the house was currently unsuitable because it was infested with bugs and mice and had holes in the walls. It is unclear when Becky moved from the Gladewater house. Jordan testified that, when she went to pick up Becky and Bill for a visit with their children on July 15, she could find nobody at the apparently vacant house. She said that Becky called a couple of weeks later, reported that she was no longer staying at the Gladewater house, and failed to provide Jordan a new address. Becky did not give Jordan her new address until a permanency hearing in October, when she claimed to be living in an apartment on McKaig Street in Gladewater—an address Jordan was unable to verify as Becky's residence.

---

[8]Although she refers to Bill's mother as her mother-in-law, Becky and Bill have never been married.

Becky also testified that she has been staying in Longview since November or December 2014. However, Jordan testified that, in a face-to-face meeting in December 2014, Becky claimed to be staying at the apartment in Gladewater. After Jordan told her that she had been by the apartment and found no one living there, Becky did not provide another address where she was staying.

It is uncontested that Becky completed the parenting classes required under her service plan and attended all hearings in the case. Since she was without transportation, she walked to the classes and hearings in Longview, even when she was living in Gladewater. Becky completed her psychological evaluation with Winsted in February 2015. She and Bill began their individual and family counseling in February, and they were in the process of completing it at the time of trial. Bill also completed parenting classes and had a drug assessment as required under the service plan.

Bill testified that he has been living in Liberty City for a couple of months. Before that, he had had no residence for almost a year.[9] He admitted that he is not listed as the father of the children on their birth certificates and that he had never acknowledged paternity until the initial hearing in this case. Bill admitted that he has used marihuana and other illegal drugs, including PCP. He also admitted smoking marihuana in the Gladewater house where Becky and the children lived. He explained that the children know how to roll a marihuana cigarette because he has rolled them in front of them. Bill also admitted using methamphetamine once or twice a month up until a couple of months before trial. He testified that he does not have a place for the children to live. He also admitted that he has not made any child support payments as required by the temporary orders. Bill testified that, when he was home with the children, he made sure they were bathed,

---

[9]Apparently, for 145 days of this time, Bill was incarcerated in the Gregg County Jail.

had food to eat, and had a place to sleep. He stated that he and the children have a great bond, that D.G. clings to him, and that K.G. clings to Becky. He testified that he is involved in their schooling, teaches them manners, and disciplines them. Bill could remember the month, but not the day, of D.G.'s and K.G.'s birthdays, but had no knowledge of the month or day of H.G's birthday. He also admitted that he had not called the children or sent them cards on their birthdays since their removal.

The temporary orders allowed Becky and Bill supervised visitation with the children for one hour per week. Nevertheless, in the eleven months between the entry of the temporary orders and the final hearing, Becky made only six, and Bill only three, visits with the children. Becky visited the children twice in June, one time each in July, August, and September, and once in March. Bill visited the children twice in June and once in March. Becky and Bill attributed the lack of visitations to the unavailability of transportation.[10] Becky explained that the children were placed with a foster mother in Nacogdoches, that she and Bill lived in Gladewater, that they would meet in Henderson for visitation, and that neither she nor Bill had a car. Initially, their caseworker, Jordan, would pick them up in Gladewater and transport them to visit the children. However, Jordan refused to pick them up in Gladewater after they had a misunderstanding regarding the time she would pick them up and they missed each other. After that, Jordan required them to come to the Department's office in Longview to get a ride to Henderson. Becky said she found a ride to Longview a couple of times after that, but then it was hard to find a ride. Becky admitted, however,

---

[10]Becky and Bill also contended the lack of visits was ameliorated by Becky calling the children every night until December. However, in December, Jordan learned that the parents were telling their children that they would be coming home soon, which began causing behavioral and emotional problems in the children when it did not happen. At that time, Jordan instructed the foster mother to no longer accept calls from the parents.

that she had been living in Longview since November or December and that Longview has a public bus system.

Jordan testified that her supervisor transported Becky and Bill from Gladewater to their first visit in June. Jordan picked them up in Gladewater for their second visit in June. She explained that the next visit was scheduled for July 15, but, when she went to their house at the appointed time, no one came out. She remained at the house, which looked vacant, for fifteen minutes before leaving. A couple of weeks later, Becky called and requested another visit, and Jordan arranged to transport her from the Department's office to Henderson. Jordan testified that Becky had a three-hour visit with the children in Henderson at the end of August. Although Jordan supervised the visit, Becky obtained transportation from a friend. The next time Becky requested a visit was the end of September. Since Jordan was out of state, she arranged for the foster mother to supervise the visit. Jordan testified that, after September, neither parent contacted her requesting a visit. Jordan later learned that, in March, the Court Appointed Special Advocates for Children (CASA) representative for the children, Tamika Wesley, transported Becky and Bill to Mount Enterprise for a visit.

Wesley has worked as the program director for CASA for eight years and has worked with over 200 families. Wesley testified that she met Becky and Bill at the fourteen-day hearing in May 2014 and has seen them at permanency conferences at the Department offices. She also ran into them at a grocery store on December 1, 2014. At that time, she expressed to them her concern that they were not visiting the children and offered to get them help to visit them. She testified that, at a February meeting regarding the upcoming trial, she was very vocal about Becky and Bill not

11

visiting, and essentially abandoning, their children. After that meeting, and after her attorney had instructed her to do so, Becky contacted Jordan and asked her if she would take her on a visit to see the children, which she did. Jordan and Wesley both testified that, during their visits with the children, Becky and Bill exhibited appropriate parenting skills and that there was loving interaction between them and their children.

Wesley testified that the children love their parents and desire to return home. She also testified that, out of her 200 cases, she has had less than one percent of the children say they did not want to go home. Although she believes the children will be devastated if they do not see their parents again, Wesley testified that there are programs and services to help them through the process. She also testified that it was highly probable that the children would be adopted since they are good, loving, and young.[11] She opined that termination would be in the best interest of the children since they would be in a "forever" family if adopted and have permanence, stability, safety, guidance, consistency, and positive role models. She testified that parents who are on a strong path for family reunification immediately work their services, remain drug free, and visit their children. She pointed out that Bill is not a good role model, considering his incarcerations and that he has not worked his services, and that Becky has not worked her services, continues to return to drug use, and will likely get back together with Bill.

Tommie Smith testified that, when the children first came to live with her, H.M.G. could not speak clearly, put on his own clothes, or eat with a fork and spoon. Now he is in speech therapy

---

[11]Jordan testified that the Department's permanency plan for the children is a non-relatives adoption. Although acknowledging that there was a possibility that the children could be separately adopted, Womack testified that the Department will always seek to have them adopted together. She also testified that she is familiar with several families who are waiting to adopt sibling groups.

and is talking better, he can dress himself, and he eats at the table with utensils. She has taught the older children to do household chores and has taught them good manners. She testified that, when their parents stopped coming for visits, they were very upset, angry, acting out, and fighting with each other, and that H.M.G. would cry for his mother. About a month after the children came to live with Smith, she started them in counseling with Latoya Walker, a licensed professional counselor. Smith testified that, initially, D.G. and K.G. did well in school, but around Thanksgiving, began displaying serious behavior problems, which have gotten progressively worse. She said that, after the last visit with their parents in March, the children were crying because they wanted to go home with them. She also testified that the children love their parents and will be upset if they never get to see them again. Smith testified that she loves the children, that they love her, and that, although she is not looking to adopt them, she would keep them as long as she could until an adoptive family is found.

Walker began working with the children on June 12, 2014. She works with K.G. on anger and anxiety issues and helps him to improve his communication skills and in building trust. She works with D.G. on these same issues, which she relates to instability. She also testified that, although D.G. praises his parents a lot, he is very reluctant to talk about them or to say anything negative about them or about his past history. She testified that there is trauma associated with removal from the parents, but that the long-term result of removal may be better than the alternative. Walker also explained her role in overcoming this trauma and building new relationships. She testified that the children do very well with their foster mother and that they are very caring and respectful toward her. She said the home has rules and boundaries and is very

13

stable and conducive to the children's growth. The children seem very happy and have adjusted well. Walker testified that she has noticed a difference in the emotional state of the children in the last several months. D.G. particularly had gotten upset when his parents had missed a visit, and his misbehaviors had increased, especially at school. In December, the children started saying that they were going home in February, had built up their expectations, and were upset when it did not happen. They said they had been told, she believes by their mother, that they were going home and that they still have that expectation. Walker further testified that trust is one of the main factors in building relationships and that, if a parent is not consistent and honest with a child, it carries over to mistrust of others.

She testified regarding the adverse effects of a lack of attachment and how a safe, secure environment is necessary to the development of attachments. By observing them in the foster home, she believes they will be able to form positive relationships through a continuation of the stability and security they are being provided.

Walker also testified that she has not been able to determine the effect their prior home life has had on the children. She said they love and speak highly of their parents, but are reluctant to speak anything negative. They do not speak about their past life, except about the dirty home and rodents in the home. They have never acknowledged that there was drug use in the home, and Walker testified that it is hard to tell if they are keeping secrets.

Walker believes the children need consistency and stability and that removal from the parents is in their best interest. She agreed that there would be some degree of devastation if the parental rights were terminated and that there are potential long-term consequences of breaking

14

the parental bond. However, she also stated that there can be both negative and positive consequences. She testified that the children are in a stable home now and that the parent's failure to alleviate their deficiencies and their continued inconsistency would not be healthy for the children.

Winsted testified that he performed a psychological evaluation of Becky in February 2014. Becky had a history of abuse or neglect and using controlled substances, demonstrated poor impulse control, and had some emotional issues that would affect her parenting skills. Her expressed parenting attitudes were generally acceptable, so that potential physical abuse of the children was not a concern. Becky self-reported to him that she had been an alcoholic and that she had used marihuana daily and methamphetamine every other day until late December 2014. She also reported that her support system was AA and Narcotics Anonymous (NA). Since she had completed her parenting classes, Winsted recommended individual counseling for six months to two years, continuing her aftercare substance-abuse treatment with random drug screenings, and consultation with a medical doctor for treatment of her anxiety and depression. He testified that, in his opinion, Becky took the mandate to complete her services seriously, that she was active and participated in her parenting classes, and that she was very open, honest, and engaged.

Winsted further testified that children need to feel safe, which happens when parents reliably and consistently meet their needs. If parents are making and failing to fulfill significant promises, such as "you're going to come home," the children's ability to trust and their sense of safety is eroded. He also testified that allowing the children to remain too long in limbo, such as foster care, also erodes their trust and sense of safety, affects their ability to learn, and results in

increasing anxiety, stress, and behavioral problems. On cross-examination, he testified that the same type of issues arise when a parent's parental rights are terminated. Winsted also testified at length regarding the process of forming attachment bonds between a child and his or her parent, particularly his or her biological mother, and the effects of the severance of that bond resulting from termination. He also testified, however, that the problems arising from this severance can be resolved if there is appropriate intervention, like helping the child work through grief and loss issues and helping to facilitate new attachment bonds with a new family.

In considering whether termination is in the best interest of the child, "[t]here is a strong presumption that keeping a child with a parent is in the child's best interest." *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at *7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)). "Termination 'can never be justified without the most solid and substantial reasons.'" *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). Even if a parent's behavior "'may reasonably suggest that a child would be better off with a new family, the best interest standard does not permit termination merely because a child might be better off living elsewhere.'" *In re A.H.*, 414 S.W.3d 802, 807 (Tex. App.—San Antonio 2013, no pet.) (quoting *In re W.C.*, 98 S.W.3d 753, 766 (Tex. App.—Fort Worth 2003, no pet.)).

In determining the best interests of the child, courts consider the following *Holley* factors:

> (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals,

(7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*N.L.D.*, 412 S.W.3d at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b) (West 2014). It is not necessary to prove all of these factors as a condition precedent to terminating parental rights. *C.H.*, 89 S.W.3d at 27; *N.L.D.*, 412 S.W.3d at 819. Evidence relating to a single factor may suffice in a particular situation to support a finding that termination is in the best interests of the child. *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002)). When considering the child's best interest, we may take into account that a parent is unable to provide adequate care for a child, lacks parenting skills, or exercises poor judgment. *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.). Parental drug abuse, which reflects poor judgment, is also a factor that may be considered when determining the child's best interest. *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.). Further, the amount of contact between the parent and child, the parent's failure to provide financial and emotional support, continuing criminal history and past performance as a parent are all relevant in determining the child's best interests. *See C.H.*, 89 S.W.3d at 28.

It is undisputed that there is a strong emotional bond between these children and their natural parents and that they have expressed their desire to return to their parents. Their expressed

17

desire is ameliorated somewhat by their young ages, especially in the case of H.M.G. Nevertheless, this factor weighs against termination.

Becky's drug use while she was pregnant with K.G. and H.M.G. placed them in physical danger. Her continued use of methamphetamine in the home placed all three children in physical danger before removal. Although at trial Becky disputed her prior statements to Winsted that she continued to use methamphetamine every other day and marihuana daily for seven months after the children were removed, a rational jury could believe her prior statements and conclude, considering her past history of returning to drug use, that returning the children to her would also place them in danger in the future. The evidence also showed that the foster home is safe and stable and that the physical needs of the children are being met. This factor weighs strongly in favor of termination.

It is also undisputed that the longer the children have remained in foster care, the more severe their emotional and behavioral problems have become. There was conflicting testimony regarding what might be the cause of these problems. Winsted testified that these problems can be caused in children by the severance of the parental bond resulting from removal, but can also be caused by the parents continually making significant promises that they do not keep. Both the foster mother and the children's counselor testified concerning the devastating effects on the children's emotional health resulting from Becky and Bill's failure to show up for visits and their broken promises that the children would get to go home. Significantly, the foster mother testified that the children's emotional and behavioral problems began when Becky and Bill stopped visiting them. A rational jury could conclude that the emotional and behavioral problems they are currently

18

experiencing result primarily from Becky and Bill's acts and omissions. In addition, there was considerable testimony regarding the problems that children experience as a result of the termination of parental rights. However, both Winsted and the children's counselor testified that these problems can be overcome with appropriate counseling. The children's counselor testified that she will continue to help the children deal with their loss and form new relationships. Further, the evidence showed that neither Becky nor Bill had a stable residence or income, that neither provided financial support for the children after removal, and that both continued their use of illegal substances for seven months after removal. The second, fifth, and seventh factors also weigh heavily in favor of termination.

The evidence shows that Becky and Bill generally demonstrated appropriate parenting skills and loving interaction on their visits with the children. However, Bill's continuing criminal history, his drug use in the presence of the children, his failure to provide financial support for the children, and his minimal efforts to visit the children demonstrate his lack of good judgment, lack of parenting skills, and inability to place the needs of his children above his own. Likewise, Becky's drug use while she was pregnant and in the presence of the children, her continual relapses after treatment, her failure to provide financial support for the children, and her minimal efforts to visit the children demonstrate her lack of good judgment and inability to place the needs of the children above her own. Although she blamed her failure to visit on her lack of transportation, she offered no explanation for why she did not visit the children after she moved to Longview in November or December where transportation was readily available. The fourth, eighth, and ninth factors also weigh heavily in favor of termination.

19

Finally, Bill expressed no plans for the children. Becky's plans were to house the children in a small apartment where she had been living "off and on." Although she maintained at trial that she was working four hours a day and was looking for other clients, she offered no firm plan for how she would financially support the children. In contrast, the children are currently in a stable, safe foster home where their emotional and physical needs are being met and where they can remain until adopted. Although no adoptive family has been identified, the Department plans to seek to place the children together with an adoptive family. This factor also weighs in favor of termination.

We find that there is legally and factually sufficient evidence to support the jury's finding that termination of the parental rights of Becky and Bill is in the best interests of the children. We overrule these points of error.

*(2)*     *Neither Mistrial Nor Cross-Examination of the Juror Was Required*

Becky and Bill argue that the trial court erred in denying their motion for mistrial for alleged juror misconduct and in denying their request to cross-examine the allegedly offending juror. Becky and Bill claim juror 17 withheld information regarding his relationship with Sedelia Nelson, who has been identified as an investigator for the Gregg County District Attorney's Office,[12] and that they were denied the opportunity to fully explore that relationship by cross-examining the juror. The State argues that, since the juror was not asked during voir dire whether he knew Nelson, Becky and Bill have failed to show any misconduct. We agree.

---

[12]Although the parties agree that Nelson is an investigator for the Gregg County District Attorney's Office, she was never identified as such to the jury panel.

The issue of juror misconduct arose at the conclusion of the first day of testimony when, as the jury was filing out, juror 17 made a sort of hand motion toward Nelson, smiled, and may have said a word or two to her. Nelson backed up and did not say anything in response. This brief interaction prompted a motion for mistrial, alleging that juror 17 had failed to disclose a relationship with Nelson. The motion was not supported by affidavit. After a considerable exchange regarding Becky and Bill's specific allegation of misconduct,[13] the parties agreed that the preliminary determination for the trial court would be whether Nelson was a friend or family member of juror 17. The trial court then questioned juror 17, who claimed that Nelson was neither a friend nor a family member.[14] Based on this testimony, the trial court denied the motion for mistrial and the request that the parents be allowed to question juror 17.

To preserve a complaint about jury misconduct, a party must typically file a motion for new trial, supported by an affidavit. TEX. R. CIV. P. 324(b)(1), 327(a); *Welsh v. Welsh*, 905 S.W.2d 615, 618 (Tex. App.—Houston [14th] 1995, writ denied). When a party moves for a mistrial for jury misconduct and the trial court hears evidence of the alleged misconduct during trial, we have previously treated the motion for mistrial as a motion for new trial. *See Kansas City S. Ry. Co. v. Chaffin*, 658 S.W.2d 186, 189 (Tex. App.—Texarkana 1983, writ ref'd n.r.e.); *see also In re Health*

---

[13]The record of this exchange shows that the four attorneys, although agreeing on what questions were asked during voir dire, disagreed as to the meaning of those questions, prompting the trial judge to remark, "If four lawyers can't understand the question, how are we expecting a juror member to properly respond? . . . . It's not real clear if there's four different viewpoints on it."

[14]Juror 17 testified that Nelson had worked at the high school as a resource officer. Although he knew her by sight, he did not know her by name. He said that she was not a family member and that he did not consider her a friend, just an associate. He also testified that his knowledge of her would not influence his consideration of the evidence in the case.

*Care Unlimited, Inc.*, 429 S.W.3d 600, 601–02 (Tex. 2014); *Welsh*, 905 S.W.2d at 618. To be entitled to a new trial due to juror misconduct, "the movant must establish that (1) the misconduct occurred, (2) it was material, and (3) it probably caused injury." *Health Care Unlimited, Inc.*, 429 S.W.3d at 602 (citing TEX. R. CIV. P. 327(a)). "Whether misconduct occurred and caused injury are questions of fact for the trial court." *Id.* (citing *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000)). Under Rule 327(a), if a juror gives an "erroneous or incorrect answer on voir dire examination," a new trial may be granted. TEX. R. CIV. P. 327(a); *Jefferson v. Helen Fuller & Assocs. Health, Inc.*, No. 01-11-00199-CV, 2012 WL 2357431, at *8 (Tex. App.— Houston [1st Dist.] June 21, 2012, pet. denied) (mem. op.). However, "[f]or false answers to voir dire questions to entitle a party to a new trial, the concealment must be in response to a specific and direct question calling for disclosure." *Jefferson*, 2012 WL 2357431, at *8 (citing *Wooten v. S. Pac. Transp. Co.*, 928 S.W.2d 76, 79 (Tex. App.—Houston [14th Dist.] 1995, no writ)). We will not disturb the trial court's decision to grant or deny a new trial or mistrial, based on juror misconduct, absent an abuse of discretion. *Primrose Operating Co. v. Jones*, 102 S.W.3d 188, 193 (Tex. App.—Amarillo 2003, pet. denied); *Welsh*, 905 S.W.2d at 618; *Chaffin*, 658 S.W.2d at 189.

Becky and Bill do not argue that juror 17 was individually asked any direct questions. Rather, they argue that he had a duty to disclose his acquaintance with Nelson at three points during voir dire: when asked whether anyone knew the attorneys, when asked whether anyone knew the witnesses, and when asked whether anyone worked in the district attorney's office, had family or

friends that worked there, or worked someplace where they had regular contact with attorneys. We disagree.

The record shows that, at the beginning of voir dire, the trial court introduced the two assistant district attorneys, the Department's representative, Sogunda Strange, the CASA representative, Tamika Wesley, and the attorneys representing Becky, Bill, and the children. The court then asked if anyone on the jury panel knew any of them. Since Nelson was not identified by the trial court, the juror was under no obligation to disclose that he knew her in response to the court's question.

Later, at the beginning of the Department's voir dire, its counsel identified Nelson as "part of the district attorney's office" and stated, "She works with us, works with our office." However, neither the Department's counsel, nor counsel for either Becky, Bill, or the children, ever asked the jury panel if anyone knew Nelson. Again, since none of the attorneys specifically inquired if anyone on the jury panel knew Nelson, no disclosure was required.

Then, during Becky's voir dire, her counsel asked the jury panel:

> Now, there's also going to be a number of witnesses that are called to testify in this case. I'd like to know if you know any of them personally, or perhaps your friends or family members know them personally. If you've had any dealings with these people, just please let me know. I'm going to go slow, and if you recognize any of the names or you think you might recognize the name, please raise you card and stand up and let me know what that relationship is.

He then read off a list of the names of the witnesses.[15] However, Nelson's name was not included in the list. Again, no disclosure was required since Nelson was not identified among the witnesses.

---

[15]Nelson was not a witness at the trial.

23

Finally, Becky's attorney asked the jury panel:

Has anyone else worked in either the district attorney's office here or another county? Does anyone have any friends or family members that have worked in the district attorney's office? Has anyone worked at a place that has regular contact with attorneys, like a courthouse? Same question about friends and family members. Do you have any friends or family members that have had any dealings with attorneys?

While we believe asking a jury panel multifarious questions in this manner is confusing and would not qualify as a specific and direct question, even if we consider each question individually, all of the questions referred to either the jury panel members' personal experience or that of their friends or family. None of the questions asked the jury panel if any of them were acquainted with anyone who has worked in a district attorney's office or who had regular contact with attorneys. Since Nelson was not a family member of juror 17 and did not consider her a friend, it was not misconduct for him to remain silent.

Since juror 17 was never asked a specific and direct question requiring him to disclose his acquaintance with Nelson, the trial court did not abuse its discretion in finding that juror misconduct had not been shown and in denying Becky and Bill's motion for mistrial. We overrule this point of error.

We also conclude that the trial court did not err in denying Becky and Bill's request to cross-examine juror 17. A motion for new trial based on juror misconduct must be supported by affidavit. TEX. R. CIV. P. 327(a). The purpose of the affidavit requirement is to assure the trial court that the movant will be able to support the allegations in his motion by competent proof. *In re Zimmer, Inc.*, 451 S.W.3d 893, 901 (Tex. App.—Dallas 2014, no pet.). The motion and affidavit enable the trial court to "make an initial determination as to whether material misconduct

24

occurred." *Elston v. Sherman Coca-Cola & Dr. Pepper Co.*, 596 S.W.2d 215, 217 (Tex. Civ. App.—Texarkana 1980, no writ) (citing *Whited v. Powell*, 285 S.W.2d 364 (Tex. 1956)). If material misconduct is not shown by the affidavit, "the court need not consider evidence on the motion." *Id.* (citing *Cortez v. Med. Protective Co. of Ft. Wayne*, 560 S.W.2d 132 (Tex. Civ. App.—Corpus Christi 1977, writ ref'd n.r.e.)). In this case, in the absence of supporting affidavits, the trial court made its initial determination of whether misconduct occurred by questioning juror 17. Based on the answers it received, the trial court determined that no material misconduct had occurred; therefore, it was under no obligation to consider additional evidence, whether through direct or cross-examination.[16] We overrule this point of error.

*(3)      Any Error in Failing To Give the Instructions Required by Rule 226a Was Waived*

Becky and Bill also assert that the trial court erred when it failed to give the instructions to the jury panel, and, later, to the jury after selected, as mandated by Rule 226a. *See* Tex. R. Civ. P. 226a. They assert, without explanation, that, since the specific instructions mandated by Rule 226a were not given, they were denied a fair and impartial trial and that such error was fundamental error. The State argues that any error by the trial court in failing to give these instructions is not fundamental error and that since Becky and Bill failed to timely object to their omission by the trial court, any error was waived. We agree.

---

[16]We recognize, as Becky and Bill argue, that the right to cross-examine witnesses is a fundamental due process right,"[p]rotected by both the Fourteenth Amendment to the United States Constitution and [A]rticle I, [S]ection 19, of the Texas Constitution." *Nat'l Family Care Life Ins. Co. v. Fletcher*, 57 S.W.3d 662, 666 (Tex. App.—Beaumont 2001, pet. denied). However, since they did not meet their initial burden of showing the trial court that they would be able to support the allegations of juror misconduct, they did not establish their right to an evidentiary hearing. *See Zimmer*, 451 S.W.3d at 901. Therefore, no right to cross-examination ever arose.

An issue is not preserved on appeal unless the record shows that it was presented to the trial court "by a timely request, objection or motion" that "stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a)(1)(A); *In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003). Further, failure to assert an objection in the trial court based on due process, or other constitutional provisions, will not preserve the complaint on appeal in parental rights cases. *In re K.A.F.*, 160 S.W.3d 923, 928 (Tex. 2005); *L.M.I.*, 119 S.W.3d at 711; *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 860–61 (Tex. 2001). "Appellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution." *In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003). In addition, although the fundamental-error doctrine provides a narrow exception to these preservation rules,[17] this doctrine has not been applied in parental-rights termination cases. *Id.* at 350–51.

Errors relating to "the procedures of summoning, assembling, excusing, and documenting the jury array . . . are waivable." *Mann v. Ramirez*, 905 S.W.2d 275, 278 (Tex. App.—San Antonio 1995, writ denied). Further, any error by the trial court in omitting to give the instructions mandated by Rule 226a of the Texas Rules of Civil Procedure is waived by the appellant's failure to timely complain of the same. *Beacon Nat'l Ins. Co. v. Young*, 448 S.W.2d 812, 815 (Tex. Civ. App.—Dallas 1969, writ ref'd n.r.e.); *Dealers Nat'l Ins. Co. v. Simmons*, 421 S.W.2d 669, 675–

---

[17]In civil cases, the fundamental-error doctrine has been applied to allow review of unpreserved error "when the record on its face shows the court lacked jurisdiction," and "certain types of error in juvenile delinquency cases." *B.L.D.*, 113 S.W.3d at 350.

76 (Tex. Civ. App.—Houston [14th Dist.] 1967, writ ref'd n.r.e.). In this case, Becky and Bill admit that they made no objection to the trial court's failure to give the instructions required by Rule 226a. In addition, the trial court gave certain instructions, albeit not all of the instructions mandated by Rule 226a,[18] to both the jury panel during voir dire and to the jury after it was seated. After giving these instructions, the trial court asked the attorneys whether they wanted additional admonishments or instructions to be given. On both occasions, the attorneys for Becky and Bill answered, "No, Your Honor." We find that Becky and Bill have not preserved any error for our review. We overrule this point of error.

*(4)     No Jury-Charge Error Was Preserved*

Becky and Bill also complain that the trial court erred in submitting a broad form jury issue that encompassed both the statutory grounds for termination and best interests of the children. Becky and Bill argue that these are separate legal questions and should be submitted in separate issues. In a related point of error, they argue that this broad form submission was fundamental error that violated their right to due process and that this Court should apply the egregious-harm standard to this jury-charge error. We find that they have not preserved any jury charge error.

---

[18]The instructions given by the trial court included the substance, but not the verbatim wording, of some of the instructions mandated by Rule 226a of the Texas Rules of Civil Procedure.

27

The Texas Supreme Court has addressed a similar complaint. *See B.L.D.*, 113 S.W.3d at 348–55. As in this case, the trial court in *B.L.D.* submitted a jury charge with two statutory grounds alleged in the disjunctive and broad-form jury issues regarding whether the parent-child relationships should by terminated.[19] *Id.* at 348. Also as in this case, the appellants in *B.L.D.* did not object to the form of the jury charge. *Id.* at 349. In *B.L.D.*, the court of appeals reviewed the unpreserved complaint, holding that "procedural due process concerns required review of 'core issues' in the jury charge in involuntary termination cases even when the parties failed to object to the charge at the trial court." *Id.*; *see In re B.L.D.*, 56 S.W.3d 203, 215–17 (Tex. App.—Waco 2001), *rev'd*, 113 S.W.3d 340 (Tex. 2003). In reversing, the Texas Supreme Court held that the fundamental-error doctrine does not permit, and due process does not require, "appellate courts [to] review unpreserved complaints of charge error in parental rights termination cases." *Id.* at 351, 354. Since Becky and Bill failed to make a timely objection to the charge, they have failed to preserve any error for our review. *See* TEX. R. APP. P. 33.1(a)(1)(A); *B.L.D.*, 113 S.W.3d at 355. We overrule these points of error.

We affirm the judgment of the trial court.

Josh R. Morriss III
Chief Justice

Date Submitted:     September 24, 2015
Date Decided:       October 28, 2015

---

[19]In this case, the jury charge alleged five statutory grounds for termination against Becky and four statutory grounds against Bill.